Helen SMITH, Individually and as Independent Executrix of the Estate of Alfred Smith, Deceased, Appellant,

v.

Carl D. SMITH, et al., Appellees.

No. 12–82–0178–CV.

Court of Appeals of Texas, Tyler.

May 30, 1985.

Rehearing Denied July 25, 1985.

John W. Mitchell, Ramsey Mitchell & Mitchell, San Augustine, for appellant.

Richard C. Hile, Tonahill, Hile & Lester, John H. Seale, Seale, Stover, Coffield, Gatlin & Bisbey, Jasper, for appellees.

COLLEY, Justice.

Helen Smith, the surviving wife of Alfred Smith, individually and in her capacity as Independent Executrix of the Estate of Alfred Smith, appeals from a judgment rendered by the District Court of Sabine County in a suit brought against her in such capacities by Carl D. Smith, son of the deceased, and Tracy Smith and Shane Smith, grandsons of the deceased. The parties will be referred to in this opinion as follows: Helen Smith as Wife; Carl D. Smith as Carl; Tracy and Shane Smith as Grandchildren; and Alfred Smith as Smith.

This suit was filed by Carl, and the Grandchildren thereafter intervened, adopting Carl's pleadings. Carl and the Grandchildren, plaintiffs/appellees, sought cancellation of a deed executed by Smith some six months before his death and recovery from Wife of the proceeds received by her from the sale of certain farm machinery and equipment made by Smith before his death. Carl and the Grandchildren alleged that Smith did not have the required mental capacity to execute the deed and to make the sales of the personal properties in question. Following a trial to a jury, and based on the jury verdict, the trial court rendered judgment in favor of Carl and the Grandchildren against Wife.

The jury found in response to Special Issues 1 and 2 that Smith did not have sufficient mental capacity on June 19, 1979, to understand the nature and effect of his acts in executing the deed[1] to Wife, and that he did not have sufficient mental capacity to understand the nature and effect of his acts in executing bills of sale to the farm machinery and equipment.[2] In answer to Special Issues 3 and 4, the jury found the value of the farm equipment and machinery to be $7,100.

The trial court submitted Special Issue 5 over Wife's objection[3] that the same was not supported by the pleadings. That issue, and the jury's answers thereto, read:

SPECIAL ISSUE NO. 5

What do you find from a preponderance of the evidence to be the value of separate property of Alfred Smith, excluding the property described in the deeds of June 19, 1979?

You are instructed that 'separate property,' as used herein, means property owned by Alfred Smith before his marriage to Helen Smith, and property he inherited or received by will during his marriage to Helen Smith.

In answering this Special Issue, you shall consider each of the following elements, and write in the amount after each one:

(a) The reasonable value of the stock of merchandise which was owned by Alfred Smith immediately before his marriage to Helen Smith—$34,500;

(b) The reasonable value of the cattle which was owned by Alfred Smith immediately before his marriage to Helen Smith—$16,500;

(c) The amount of personal property inherited by Alfred Smith from his father, Ebb Smith, and his mother, Lula Smith—$8,000;

(d) The amount of money received by Alfred Smith or Helen Smith from the sale of real property that he inherited from his father, Ebb Smith, and his mother, Lula Smith—$7,500.00.

Wife, by her first point of error, claims, as we understand her argument under the point, that the district court had no jurisdiction of the subject matter of the suit except to determine whether Smith possessed the requisite mental capacity to execute a deed and make sales of certain personal property. Wife seems to concede that the district court has jurisdiction to set aside the deed and the sales of the personal property made and executed by Smith before his death, but at the same time argues that the district court had no jurisdiction to make a

---

1. A bill of sale of a small tractor was also signed by Smith in favor of Wife.

2. No time was fixed in the special issue.

3. No point is presented by Wife relating thereto.

determination of the ownership or character of the property which was the subject of the deed and the sales. Because of the somewhat inconsistent nature of the arguments presented, we shall, in this opinion, treat the point, in part, as challenging the jurisdiction of the district court to entertain the suit in its entirety. Wife contends in her remaining points of error that the evidence is factually insufficient to support the jury verdict, and that the trial court erroneously included in the money judgment $5,200 representing future rentals on a lease signed and executed by Wife and Smith to W.L. Griffin as lessee. We reverse and remand.

Documentary evidence introduced at trial reveals that Smith executed his last will and testament on September 3, 1976. The will was admitted to probate and record in the constitutional County Court of Sabine County on February 4, 1980. Letters Testamentary were issued to Wife as Independent Executrix on the same date. Under the terms of the will, Carl received the ranch, consisting of some 335 acres of land, and all of the equipment used in connection with the operation of the ranch, including tractors, hay balers and a 4-wheel drive pickup truck. Smith devised his separate property one-half to Carl and one-half to Grandchildren, including "... proceeds from the sales of my separate property which I have made in the past." He devised all his interest in the community property to Wife. This suit was filed by Carl on January 22, 1980. In his original petition Carl sought only to cancel the deed from Smith to Wife. On September 8, 1981, Grandchildren filed their intervention herein. On May 26, 1981, Carl filed his first amended original petition under which he sought to recover the proceeds from the sale of certain personal properties, as well as to cancel the deed to Wife. The record demonstrates that Smith, not Wife, sold the cattle and all the articles of personal property described in Carl's amended pleadings.

Under her first point Wife contends that the district court had no jurisdiction of this suit and cites us to the decisions in several cases, among which are *English v. Cobb*, 593 S.W.2d 674 (Tex.1979); *Lucik v. Taylor*, 596 S.W.2d 514 (Tex.1980); and *Novak v. Stevens*, 596 S.W.2d 848 (Tex.1980).

Article V, § 8 of the TEX. CONST. grants broad general jurisdiction to district courts. In part, such section provides that the district court "shall have general original jurisdiction over all causes of action whatever for which a remedy or jurisdiction is not provided by law or this constitution, and such other jurisdiction, original and appellate, as may be provided by law." TEX.REV.CIV.STAT.ANN. art. 1906, 6 implementing the constitutional grant of jurisdiction to the district court, provides that district courts shall have original jurisdiction of suits whether at law or in equity where the amount involved in the controversy equals or exceeds $500. TEX.PROB. CODE ANN. Section 149A [4] (Vernon 1980) provides that any interested person may demand an accounting from an independent executor, and if the demand is not met, that such person may enforce the demand "by an action in the county court, *or by suit in the district court.*" (Emphasis added.) Section 149B of the Code provides that a devisee may also bring an action for accounting and distribution either in the county court which has a lawyer judge, a statutory probate court, a county court at law, with probate jurisdiction, *or in a district court of the county.* Such sections authorize and empower the court hearing the matter to order distribution and final settlement of the independent administration. The court in *English v. Cobb, supra,* construed the ʹ1973 constitutional amendment and the provisions of Section 5(d) as enlarging the jurisdiction of courts *exercising probate jurisdiction* to include "... 'matters incident to an estate'...." The Supreme Court reaffirmed the construction made in *English* in its opinion in *Lucik v. Taylor, supra,* in this language: "The obvious purpose of these changes [1973 Amendments] was to increase the jurisdiction of such [probate] courts in 'matters

---

**4.** All reference to Sections are to the Texas Pro- bate Code.

incident to an estate'...." In *Novak v. Stevens, supra,* the Supreme Court, speaking through Justice Pope, stated: "The phrase, 'incident to an estate,' has been given a broad meaning. In *English v. Cobb* [citation omitted], we held that a county court at law [with probate jurisdiction] which now has *concurrent jurisdiction* with that of a district court in probate matters could adjudicate an estate's right to a savings account ... because it was a matter incident to an estate." *Novak v. Stevens, supra* at 851. (Emphasis added.)

 We conclude from our careful study of the foregoing opinions of the Supreme Court, that the jurisdiction of constitutional and statutory county courts has been increased by the enactment of Sections 5(d)[5] and 5A(a)[6] pursuant to the authority of the 1973 constitutional amendment to art. V § 8 of the TEX. CONST. to include power to decide all matters incident to or appertaining to an estate of a decedent or ward. We further conclude, however, that such grant of jurisdiction is not exclusive and that neither of such subsections, nor any other enactment of the legislature, has stripped the district court of jurisdiction granted that court by other provisions of the constitution and statutes of this state discussed above. ACCORD: *Hopkins v. Daniels,* 571 S.W.2d 413 (Tex. Civ.App.—Texarkana 1978, writ ref'd n.r. e.); *Petsch v. Slator,* 573 S.W.2d 849 (Tex. Civ.App.—Austin 1978, writ ref'd n.r.e.); *Gordy v. Alexander,* 550 S.W.2d 146 (Tex. Civ.App.—Amarillo 1977, writ ref'd n.r.e.); *Mejorda v. Gonzalez,* 663 S.W.2d 891 (Tex. App.—San Antonio 1983, no writ); *McPherson v. Judge,* 592 S.W.2d 406, 407 (Tex.Civ. App.—Amarillo 1979, no writ). It must be

understood that we are not holding that a district court, sitting in a county in which there is no statutory probate court and no other statutory court exercising original *probate jurisdiction,* has *concurrent jurisdiction* in probate matters as defined in Section 3(bb) as "probate proceedings," "proceedings in probate" and "proceedings for probate" which include applications to probate wills, for letters of guardianship and of administration, etc. The district court's jurisdiction of "contested probate matters" is controlled by TEX.PROB. CODE ANN. Section 5(b) (Vernon Supp. 1985). A district court so situated has *concurrent jurisdiction* with such county courts of all suits and causes of action at law or in equity granted it by constitutional and statutory provisions when such suits and causes of action involve matters incident to or appertaining to an estate of a decedent or ward. Our holding here, that the district court has concurrent jurisdiction with a constitutional county court respecting the cancellation action brought by Carl and Grandchildren, is in direct conflict with our recent decision in *Nichols v. Prejean,* 673 S.W.2d 394, 396 (Tex.App.—Tyler 1984, no writ). Therefore, we overrule *Nichols v. Prejean.*

 Respecting that part of the action seeking recovery of the proceeds from the sale of farm machinery and equipment, and the separate property funds derived from sales of Smith's separate property, we hold that the trial court likewise had concurrent jurisdiction of such subject matter under the provisions of Section 149A and Section 149B of the Code. The question of whether the demand for distribution of such assets to Carl and the Grandchildren was

---

**5.** (d) All courts exercising original probate jurisdiction shall have the power to hear all matters incident to an estate. When a surety is called on to perform in place of an administrator or guardian, all courts exercising original probate jurisdiction may award judgment against the personal representative in favor of his surety in the same suit.

**6.** (a) In proceedings in the constitutional county courts and statutory county courts at law, the phrases 'appertaining to estates' and 'incident to an estate' in this Code include the probate of

wills, the issuance of letters testamentary and of administration, the determination of heirship, and also include, but are not limited to, all claims by or against an estate, all actions for trial of title to land incident to an estate and for the enforcement of liens thereon incident to an estate, all actions for trial of the right of property incident to an estate, and actions to construe wills, and generally all matters relating to the settlement, partition, and distribution of estates of wards and deceased persons.

premature under Section 149B is not before us. But such question does not affect the jurisdiction of the district court. Wife's first point of error is overruled insofar as it relates to the jurisdictional question presented.

The record reflects that Wife and Smith were married on February 16, 1960. At the time of this marriage Smith owned as a part of his separate property and estate all of the real estate involved in this controversy. He owned sixty head of cattle and was operating a small grocery store and gas station. The evidence reveals that several small tracts of Smith's separate property and the grocery store inventory were sold by him prior to his death. Smith sold all of his livestock shortly before his death. It is established by the evidence that the proceeds from the sales of the real estate, the store inventory, and the cattle were deposited into a joint bank account of Smith and Wife into which the profits from the store operated by Smith and Wife from 1960 until about July 6, 1978, had also been deposited. In short, it is undisputed that funds belonging to Smith's separate estate and community property funds were commingled for many years. Carl and the Grandchildren made no attempt at trial to establish the identity and amount of Smith's separate property funds received from the sales of his separate property lands and personal property. Wife testified, without contradiction, that she and Smith operated the grocery business until 1978 and bought and sold cattle from the time of their marriage in 1960 until the time the cattle were sold in 1979, prior to Smith's death on November 3, 1979.

Numerous witnesses testified respecting the mental capacity of Smith as it existed on June 19, 1979. The only medical witness appearing was Dr. Grover Winslow who was produced by Carl.

The testimony of Dr. Winslow reveals that in July 1978 Smith was informed that he had developed cancer in the tissues of his right lung following. his examination at M.D. Anderson Hospital in Houston. Dr. Winslow testified that Smith's condition could not be helped by surgery. Certain therapy was conducted under the direction of the staff at M.D. Anderson, but Smith's condition continued to deteriorate, and on June 14, 1979, he suffered a "stroke" which produced a partial paralysis of the left side of his body. Dr. Winslow then transferred Smith back to M.D. Anderson for evaluation. Smith was taken to M.D. Anderson on the 14th day of June and returned home the next day. Winslow testified that he was advised by an unnamed medical source at M.D. Anderson Hospital that the cancer had spread to Smith's brain, and that his condition was hopeless. Winslow also testified that he did not examine Smith after he saw him on June 14, 1979, until September 13, 1979, when he made a home visit. Dr. Winslow stated that when he visited Smith in September that Smith had become progressively worse, both physically and mentally, during the period of time from June 14 to September 13, 1979. Winslow was asked on cross-examination whether on June 19, 1979, Smith could "... have understood a business transaction, have understood the effect of a deed which is simply to transfer property? Could he have signed an instrument and known what he was doing? Did he have periods when he understood and periods he didn't?" Dr. Winslow's answer was:

A. On the medical possibilities he could have signed and known what he was doing. Now, I say he could; I have no idea of knowing. Now, to backtrack a little, basically these patients get in this condition and it's a total deterioration, but not seeing him during that time, and the possibility, yes, it is a possibility that he could have known.

On redirect examination, Dr. Winslow testified as follows:

Q. Doctor, based on reasonable medical probability,—talking about probability—would he?

A. On the medical probability, on the condition he was in on the 14th, and then the report from M.D. Anderson,

and then seeing him on the September, middle of September, the probability is that he most likely would not know, totally, but the possibility is that he could.

Giles Lowery, a cattleman who had known Smith for more than twenty-five years, testified that he had bought and sold cattle for Smith in the past, and that in July 1979 he purchased Smith's cattle. Lowery stated that the negotiations respecting the purchase of the cattle were strictly between him and Smith. Lowery stated, in effect, that Smith at that time "knew what he was doing, and that Smith's mind was clear."

Eva Smith, a legal secretary, who also was acquainted with Smith before his illness, brought the deed from Smith to Wife to Smith's home on July 19, 1979. She testified at length concerning the actual execution of the deed by Smith. She stated that she informed Smith why she was there, explained the deed and its effect to him in detail and asked him "if that was what he wanted to do." She testified that Smith told her "that it was." The evidence showed that at the same time Smith also signed a deed of gift to Carl conveying the 335-acre ranch. Eva Smith related that Smith had physical difficulties in signing his name to the deeds, and that she suggested to Wife that two persons be obtained to witness his signature. On cross-examination Eva Smith testified that in her opinion Smith understood the nature and effect of his act in signing the deeds. Both of the persons who signed as witnesses to Smith's signature on the deeds testified at trial. Joyce Campbell had known Smith for seventeen years. She was a daughter of Smith's next door neighbor. Campbell testified that Wife had asked her and her son, Bobby Schultz, to come over to the Smith home and witness the signing of "papers." Campbell's testimony corroborates the testimony of Eva Smith regarding the transaction. She also testified that in her opinion Smith understood the effect and nature of his act in signing the deeds, and that sometime after June 19 she had occasion to again visit Smith, and that on each visit Smith always recognized her and called her by her correct first name. Bobby Schultz, the other witness to the execution of the deeds, testified that in his opinion Smith was aware of the nature and effect of his acts in signing the deeds, and that he understood what lands were being conveyed by the deeds.

Richard Bass, Justice of the Peace, Precinct 1 of Sabine County, testified that he had been acquainted with Smith for "between thirty and forty years," and that in the past he had business dealings with Smith and saw him socially also. Bass related that he purchased a tractor, mower and disc plow from Smith about the middle of June 1979; that based on his previous acquaintanceship with Smith and his dealings with Smith in June 1979, he stated that Smith "talked just like he always did whenever I visited with him." Smith's sister, Duvergne Smith Corday, testified that she visited her brother regularly during the year of 1979 up until the date of his death; that she engaged in conversation with Smith on each and every visit, and she was of the opinion that during the month of June 1979 Smith appeared to be aware of his surroundings and the extent of his business.

Carl, when asked whether he had "an opinion [that] after June of 1979, this man [Smith] ever fully understood what he was actually doing?," replied "Well, I just—I don't think so." Doris Smith, Carl's wife, in response to a question inquiring if she had an opinion whether Smith after June 15, 1979, "fully understood what he was doing," testified, "I don't think ... well, you can't tell, but I don't think that he ever did, really...."

The evidence shows that after their marriage, Smith and Wife built a home on Smith's separate property lands. This home is situated on a tract of land described in Smith's deed to Wife dated June 19, 1979.

We construe Wife's first point of error as also contending that the jury's answers to Special Issue 5 will not support the

judgment in favor of Carl and the Grandchildren. In her argument, Wife points out that the evidence clearly establishes that "proceeds" from the sales of cattle, the stock of merchandise, real and personal property owned by Smith before his marriage to Wife, or that inherited by or devised to him during such marriage, were not traced and identified as separate property funds. TEX.FAM.CODE ANN. Section 5.02 (Vernon 1975) reads:

"Property possessed by either spouse during or on dissolution of marriage is presumed to be community property."

The presumption created by Section 5.02 is rebuttable; however, it is well established "that to discharge the burden imposed by the statute, a spouse, or one claiming through a spouse, must trace and clearly identify property claimed as separate property." *McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex.1973); *Tarver v. Tarver*, 394 S.W.2d 780 (Tex.1965).

As we have already observed, the evidence in this case shows that the proceeds from the sales of Smith's separate real and personal property were commingled with community property funds and earnings. Carl and the Grandchildren made no attempt to trace or identify any separate property funds of Smith into any financial institution. The jury's answer to Subdivisions (a)-(d) of Special Issue 5 establishes only the market values of the specified items of Smith's separate personal property at the time of the marriage of Smith, and at the time of acquisition thereof during the marriage, and the amount of the proceeds from the sale of separate real estate. None of such properties were on hand at the time of Smith's death. Since Carl and the grandchildren failed to secure findings that the cash proceeds from the sales of Smith's separate property, properly identified, were on hand or in existence in a specific account in a financial institution at the time of the dissolution by death of Smith's marriage to Wife, they are not entitled to recover a judgment against Wife based on the findings embodied in Special Issue 5. Wife's first point of error to such extent is sustained. Because of our holding that the findings made by the jury in Subdivisions (a)-(d) of Special Issue 5 will not support a judgment in favor of Carl and the Grandchildren, we do not address Wife's third point of error as to such findings.

Under her points 3 and 4, Wife argues that the evidence is insufficient to support the findings of the jury in response to all of the special issues submitted, and that such findings are contrary to the great weight and preponderance of the evidence.

We have carefully studied this record, and all the evidence produced before the jury, including, of course, that discussed above. We have concluded that the jury's findings in response to Special Issues 1 and 2 are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. Wife's point 4 is sustained to that extent.

Because of our decision on point 4, the answers to Special Issues 3 and 4 become immaterial and will not support a judgment in favor of Carl and the Grandchildren.

Wife under point 2 attacks the judgment. She contends that there are no pleadings to support the award in the judgment of $5,200 representing future rentals from a lease executed by Smith in 1978 to W.L. Griffin. We agree. Point 2 is sustained.

The judgment is reversed and the cause remanded.