Herbert Garner SCOTT, Appellant,

v.

Betty F. SCOTT, Appellee.

No. 10–89–258–CV.

Court of Appeals of Texas,
Waco.

Feb. 7, 1991.

Rehearing Overruled March 7, 1991.

Beverly Crowden, Terrell & Crowden, P.C., Waco, for appellant.

Charles M. McDonald and Marilee Harmon, McDonald, Harmon and Malone, Waco, for appellee.

Before THOMAS, C.J., and HALL (Retired) and MEANS, JJ.

## OPINION

THOMAS, Chief Justice.

Herbert Scott attacks the property division in the judgment divorcing him from Betty Scott. His principal complaint is that the jury mischaracterized certain assets as Betty's separate estate. Thus, he argues that the court erred when it relied on the findings in making the property division. Although the portion of the judgment granting the divorce will be affirmed, the property division will be severed and reversed and that portion of the cause remanded for further proceedings.

Herbert and Betty married on January 27, 1983. On the day before their marriage, they executed a premarital agreement containing these provisions:

[A]ll income or revenue from either party's separate property shall be deemed to be community property and shall be used to finance the ordinary and customary living expenses incurred by the parties during the marriage....

[I]f the income or revenue from the parties' separate property exceeds the amount necessary to meet the parties' ordinary and reasonable necessary living expenses ..., then, and in that event, either party may deposit such excess income and revenue to the corpus of their separate property and such funds shall then become the separate property of the spouse whose separate property produced such income or revenue....

When they married, Betty's separate estate was worth in excess of $1,000,000, consisting primarily of $400,000 in certificates of deposit, $35,000 savings, oil royalties, two Cadillacs, a 1982 GM van, a one-half interest in a Cessna 172 airplane, a residence located on ninety-eight acres in Henryetta, Oklahoma, household furnishings, jewelry, and other unspecified personal and real property. Herbert's separate property then consisted, at most, of $12,000 cash, a 1981 Cadillac, and unspecified personal effects.

Betty's accountant estimated the value of her separate property at the time of the trial at $893,000. He based this estimate on the assumption that she would receive all of the marital estate in the property division. Her separate estate still consisted primarily of the Oklahoma real estate, $400,000 in certificates of deposit, three promissory notes, oil royalties, jewelry, household furnishings, and personal effects. Herbert conceded that these "Oklahoma assets" were Betty's separate property, and made no claim against them.

He did, however, assert a community interest in the following assets: $78,607 held in escrow from the sale of the home they purchased in 1986 when they moved to Waco; household furnishings; a 1986 Cadillac being driven by Betty; and a Cessna 182 airplane. The home, Cadillac and plane were all owned in both of their names. Herbert claimed as separate property approximately $54,000 in his account at NCNB–Waco,[1] which he alleged was the balance of a $100,000 certificate of deposit Betty gave him in 1987. He also asserted that a Chevrolet Silverado pickup, a four-wheel dirt bike, and an investment in Oil Tex belonged to his separate estate.

The jury found that: (1) $19,500 of the $78,607 held in escrow belonged to the community and that the balance belonged to Betty's separate estate; (2) the community owned only $8,750 of the Cessna 182's $35,000 value and that the balance was Betty's separate property; and (3) the 1986 Cadillac was Betty's separate asset. With respect to Herbert's account at NCNB, the jury found that Betty did not give him the $100,000 certificate of deposit and that the $54,000 in his account were her separate funds.

Moreover, the jury found that: (1) $4,000 in First Federal Savings–Waco and $9 in American Bank–Waco belonged to the community; and (2) the Silverado pickup, the dirt bike, and the investment in Oil Tex were Herbert's separate property. Betty does not challenge these findings on appeal.

Based on the verdict, the court awarded Herbert as his separate property the pickup, the dirt bike, and the investment in Oil Tex. It also awarded him $16,129.50 in cash, which was one-half of the value of the community estate found by the jury. All property not specifically given to Herbert, including the $78,607 remaining in escrow from the sale of the home, the $54,000 in Herbert's account at NCNB, the 1986 Cadillac, and the Cessna 182, was awarded to Betty as her separate estate. Herbert questions the evidentiary support for findings that the money in escrow, the plane, the funds in his NCNB account, and the Cadillac were Betty's separate property. He contends that she failed to overcome the presumption that these assets belonged to the community. See TEX.FAM. CODE ANN. § 5.02 (Vernon Supp.1991). Furthermore, he claims that he overcame the community presumption and established that the money in the NCNB account was his separate property. See id.

## PRESUMPTION

■ Property possessed by either spouse during or upon the dissolution of a marriage is presumed to belong to the community. Id.; Cockerham v. Cockerham, 527 S.W.2d 162, 167 (Tex.1975). This presumption may be rebutted by clear and convincing evidence tracing the property and its mutations back to a spouse's separate estate. Id. The question is whether clear and convincing evidence overcame the presumption that the money held in escrow, the plane, and the Cadillac belonged to the community.

## FUNDS IN ESCROW

■ The parties purchased their home in Waco for $79,000 cash. Betty testified that $10,000 of the purchase price came from the sale of her separate real estate in Oklahoma, but admitted that the balance of $69,000 was from "interest income." She argues on appeal that the $69,000 were also her separate funds under the premarital agreement because the money had been "saved" from excess interest income that had not been used for ordinary living expenses.

The premarital agreement provided that either party "may deposit ... excess income and revenue to the corpus of their separate property and such funds shall then become the separate property of the spouse whose separate property produced

1. The jury found that the money in Herbert's account, "in the approximate amount of $57,-000," was Betty's separate property. The court awarded her in the judgment, however, "approximately $54,000" in the account as her separate funds. The amount in the judgment is used when referring to the balance in the account.

such income or revenue." (Emphasis added). Clearly, the parties intended any "excess" interest income to retain its community character until it was *deposited to the corpus* of a party's separate property. Merely "saving" excess interest income would not change its character from community to separate property under the premarital agreement. Tracing purchase money derived from excess interest income to Betty's separate estate would necessarily require proof by clear and convincing evidence that the excess had been deposited to the corpus of her separate assets. She failed to do this on any of the assets in controversy. Thus, her contention that the premarital agreement made any "saved" excess interest income her separate funds is rejected because of the plain intent of the parties.

■ Proceeds from the sale of separate real estate retain their separate character. *Estrada v. Reed*, 98 S.W.2d 1042, 1044 (Tex.Civ.App.—Amarillo 1936, writ ref'd). Thus, the evidence was clear and convincing enough to trace $10,000 of the home's purchase price to Betty's separate funds. Without proof that the funds had been deposited to the corpus of her separate estate, the $69,000 of interest income used to pay the balance of the purchase price belonged to the community, both under the premarital agreement and the law. *See Arnold v. Leonard*, 114 Tex. 535, 273 S.W. 799, 803 (1925).

■ Property purchased with separate and community funds is owned as tenants in common by the separate and community estates. *Cockerham*, 527 S.W.2d at 168. Percentages of ownership are determined by the amount of funds contributed by each estate to the total purchase price. *Gleich v. Bongio*, 128 Tex. 606, 99 S.W.2d 881, 883 (1937). Applying this rule to the facts, the community owned 87.34 percent ($69,000/$79,000 = 87.34%) of the home, or $68,655.35 of the $78,607 remaining in escrow from its sale. The remaining 12.66 percent of the funds in escrow, or $9,951.65, was owned by Betty's separate estate.

The jury found, however, that $19,500 of the funds in escrow belonged to the community and that the balance was Betty's separate property. She does not attack this finding on appeal. Based on the finding, the court effectively awarded Betty $59,107 ($78,607 − $19,500 = $59,107) of the funds as her separate estate. Considering only the evidence and inferences which tended to support the finding, the evidence was legally insufficient to support such an award. *See Stanglin v. Keda Development Corp.*, 713 S.W.2d 94, 95 (Tex.1986).

## CADILLAC

■ The parties registered the Cadillac in both of their names when they purchased it in 1986. Betty claimed that it was purchased by trading in a 1982 GM van belonging to her separate estate, with a $15,000 value, and paying $15,000 from "interest income" the parties had "saved." Again, she erroneously argues that the interest income belonged to her separate estate under the premarital agreement because it came from "excess" funds not used to pay ordinary living expenses.

The evidence was clear and convincing enough to support a finding that at least one-half of the Cadillac's $30,000 purchase price came from Betty's separate estate in the form of a van with a trade-in value of $15,000. The balance of the purchase price, however, came from community assets because Betty failed to offer any evidence that the interest income had been deposited to the corpus of her separate estate.

Based on the evidence, the community and Betty's separate estate owned the Cadillac as tenants in common, each owning an undivided one-half interest. *See Gleich*, 99 S.W.2d at 883. The jury found, however, that the Cadillac, which it valued at $15,000, was owned entirely by Betty's separate estate, and the court awarded it to her in the property division. Applying the standard of review for a no-evidence point, the evidence was legally insufficient to support this finding. *See Stanglin*, 713 S.W.2d at 95.

## CESSNA 182

██ The jury found that the Cessna 182, which it valued at $35,000, was jointly owned by the community and Betty's separate estate and that the community's interest was $8,750. Betty does not question this finding on appeal. She testified that they purchased the Cessna 182 in November 1986 by trading in a Cessna 177 and paying $19,000 cash. She claimed that the cash came from their joint account where in October she had deposited $50,000 from the sale of her separate real estate.[2]

Betty failed to trace the entire trade-in value of the Cessna 177 to her separate estate. Her separately owned 1981 Cadillac and $4,500 cash were used to purchase the Cessna 177, which had a purchase price of $16,500. She admitted that the $4,500 cash came from "interest income ... out of a joint account." Her contention on appeal, that the cash was her separate funds under the premarital agreement because it came from "accumulated separate property income," has already been rejected. Without proof that the "accumulated" interest income had been deposited to the corpus of her separate estate, it belonged to the community under the premarital agreement and the law. See Arnold, 273 S.W. at 803.

Having been purchased with separate and community assets, the percentages of ownership in the Cessna 177 were determined by the amount of funds each estate contributed to its purchase price. See Gleich, 99 S.W.2d at 883. Applied to the facts, the community owned 27.3 percent ($4,500/$16,500 = 27.3%) of the Cessna 177, with the remaining 72.7 percent ($12,000/$16,500 = 72.7%) being Betty's separate property.

The Cessna 182's purchase price consisted of $19,000 from Betty's separate funds and the trade-in value of the Cessna 177, an asset jointly owned by the community and her separate estate. Each estate's percentage of ownership in the Cessna 182 depended upon the amount of funds or value that each contributed to its purchase price. See

id. The percentages of ownership would then determine the amount of each estate's interest in the Cessna 182's $35,000 value. Adding the trade-in value of the Cessna 177 to the $19,000 would establish the Cessna 182's purchase price, just as deducting $19,000 from its purchase price would determine the trade-in value of the Cessna 177. Betty failed, however, to introduce any evidence of the Cessna 182's purchase price, either by proving the trade-in value of the Cessna 177 or otherwise.

Although she traced her separate assets into the Cessna 182 through the trade-in of the Cessna 177 and the $19,000 cash, the percentage of her separate ownership in the Cessna 182 could not be determined without evidence of its original purchase price. Thus, she failed to prove the value that her separate estate contributed to the Cessna 182's original purchase price, which prevented her from proving the percentage of her separate interest in the Cessna 182's $35,000 value. See id. Having failed to trace and prove the amount of her separate interest by clear and convincing evidence, Betty failed to overcome the presumption that the entire $35,000 value of the Cessna 182 belonged to the community. See Cockerham, 527 S.W.2d at 167.

Based on the finding that the community owned $8,750 of the Cessna 182's $35,000 value, the court effectively awarded Betty $26,250 of the plane's value as her separate estate. Considering only the evidence and inferences which supported the finding, the evidence was legally insufficient to support that award. See Stanglin, 713 S.W.2d at 95.

## NCNB ACCOUNT

██ Shortly after they moved to Waco, Betty placed a $100,000 certificate of deposit in Herbert's name. He claimed at trial that this was a gift of her separate funds to his separate estate. Herbert later transferred the money to an interest-bearing checking account in his name at NCNB. The balance of the account at the time of

---

**2.** Betty admitted that she regularly deposited interest income from her separate estate in the joint checking account. Their joint tax returns reflected the following interest income: (1986) $36,760; (1987) $45,925; and (1988) $43,435.

the divorce was $54,000. Undisputed evidence reflected a number of deposits and disbursements in the account.

Herbert asserted that the $54,000 belonged to his separate estate because the money was the residue of the certificate of deposit which Betty had given him. The jury found, however, that Betty did not give him the certificate of deposit and that the money in the NCNB account belonged to her separate estate. Herbert attacks the evidentiary support for these findings, arguing the evidence conclusively established that the $54,000 were his separate property.

Moreover, he contends that an irreconcilable conflict existed between the finding that the $54,000 belonged to Betty's separate estate and findings that the Silverado pickup and the Oil Tex investment were his separate assets. He points to evidence showing that the pickup and the investment were purchased either entirely or partially from funds in his account.

■ The money in Herbert's account at the dissolution of the marriage presumably belonged to the community. *See* TEX.FAM. CODE ANN. § 5.02 (Vernon Supp.1991); *Cockerham,* 527 S.W.2d at 167. The question is whether Betty rebutted this presumption by clear and convincing evidence tracing the $54,000 to her separate estate. *See id.* Either spouse may give separate property to the other. *Riley v. Wilson,* 86 Tex. 240, 24 S.W. 394, 396 (1893). Property acquired by gift during marriage is the separate property of the spouse to whom it is given. TEX. CONST. art. XVI, § 15; TEX. FAM.CODE ANN. § 5.01(a)(2) (Vernon 1975). A gift cannot occur, however, without the intent to make a gift. *Campbell v. Campbell,* 587 S.W.2d 513, 514 (Tex.Civ.App.— Dallas 1979, no writ).

Betty testified that she never intended to make a gift of the certificate of deposit; Herbert claimed just the opposite. The jury resolved the conflicting evidence on intent by finding that Betty did not give the certificate of deposit to Herbert. Legally and factually sufficient evidence supported that finding.

■ The jury also found that the money in Herbert's account was Betty's separate property. Herbert contends that the evidence was legally and factually insufficient to support this finding because Betty failed to trace the funds to her separate estate. Moreover, he claims the evidence conclusively established that the funds were his separate property because they came from the original certificate of deposit.

The inconsistency in Herbert's attitude at trial and on appeal is apparent. His position at trial was that the funds in his account were from the original certificate of deposit, *i.e.,* that the $54,000 were his separate property because they were traced to his separately owned certificate of deposit. Essentially, he conceded that the certificate of deposit was Betty's separate property when she allegedly made the gift. On appeal he contends that Betty failed to trace the money to her separate estate. He argues, in effect, that she failed to trace the balance in the account to the certificate of deposit that was placed in his name. Herbert cannot assume an attitude or assert a theory on appeal different from that at trial. *See State v. J.M. Huber Corporation,* 145 Tex. 517, 199 S.W.2d 501, 502 (1947); *Mozley v. Tabor,* 484 S.W.2d 596, 601 (Tex.Civ.App.—Waco 1972, writ ref'd n.r.e.). Accordingly, the point attacking the finding that the funds in the NCNB account belonged to Betty's separate estate cannot be sustained. *See id.*

■ Findings that the funds in Herbert's account belonged to Betty's separate estate and that the pickup and Oil Tex investment were his separate assets did not irreconcilably conflict because they can be harmonized. *See Huber v. Ryan,* 627 S.W.2d 145, 145–46 (Tex.1981). Although the pickup and investment were purchased entirely or partially from funds in Herbert's account, the jury could have reasonably found from factually sufficient evidence that Betty had allowed him to purchase the pickup and Oil Tex investment from her separate funds, thereby making a gift of these assets to his separate estate.

## SUMMARY

The jury found that $19,500 of the $78,-607 held in escrow from the sale of the home belonged to the community and that the balance, $59,107, belonged to Betty's separate estate. The evidence was legally insufficient to support the amount of the separate award, as Betty was only able to trace 12.66 percent, or $9,951.65 of the funds in escrow, to her separate estate. Likewise, the evidence was legally insufficient to support the finding that the 1986 Cadillac belonged entirely to Betty's separate estate, as she traced only one-half of the vehicle's $15,000 value to her separate ownership. Betty also failed to introduce any evidence to support the finding that her separate estate owned $26,250 of the Cessna 182's $35,000 value. She failed to establish the extent of her separate interest in the plane. Finally, the finding that the $54,000 in Herbert's account belonged to Betty's separate estate cannot be attacked on the ground that she had not traced those funds to her separate assets.

## DISPOSITION OF POINTS

 Point three, a no-evidence point, is sustained to the extent it attacks findings relating to the money in escrow, Cadillac, and Cessna 182. This point is overruled, however, insofar as it questions the finding that the funds in the NCNB account belonged to Betty's separate estate.[3] Point eight, questioning the legal sufficiency of the evidence supporting the finding relating to funds in the NCNB account, is also overruled. Factual sufficiency points one and five are overruled. Point nine, complaining of an irreconcilable conflict in the findings, is overruled. Evidentiary points six, seven, and ten, relating to the finding that Betty did not give the certificate of deposit to Herbert, are overruled. Points two and four are not reached because of the disposition of the third point.

3. The jury found in subparagraph 3 of Question 2 that the furniture and fixtures in Betty's residence in Oklahoma belonged to her separate estate. Although the third point is stated broadly enough to attack this finding, Herbert does not discuss or assert any error with respect to subparagraph 3. Any error in the finding in

## EFFECT OF ERROR ON PROPERTY DIVISION

Clearly, the jury mischaracterized a substantial amount of community assets as Betty's separate estate. The court based its division of the community on erroneous findings. Relying on findings that the community's interest had a value of only $32,259, consisting of $19,500 in escrow, $8,750 of the Cessna 182's value, and $4,009 in accounts at First Federal Savings and American Bank, the court awarded Herbert one-half of that value, $16,129.50. Evidence established the value of the community estate at $115,164.35 ($68,655.35 in escrow, $7,500 of the Cadillac's $15,000 value, $35,000 of the Cessna 182's value, and $4,009 in accounts at First Federal Savings and American Bank.)

A trial court has broad discretion in making a "just and right" division of the community estate. Tex.Fam.Code Ann. § 3.63(a) (Vernon Supp.1991); *McKnight v. McKnight*, 543 S.W.2d 863, 866 (Tex.1976). In fact, an appellate court must presume that the discretion was properly exercised until the contrary is shown. *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex.1981). The division does not have to be equal, as a trial court may weigh many factors in its decision. *Id.*

 Mischaracterizing community assets as separate property does not automatically result in a reversal of a property division. *See Jacobs v. Jacobs*, 687 S.W.2d 731, 732 (Tex.1985). Reversible error only occurs if the mischaracterization has materially affected the court's "just and right" property division. *Id.* In determining whether a property division has been materially affected, an appellate court may consider what division the trial court probably would have made if the property had been properly characterized. *Smith v. Smith*,

subparagraph 3 has been waived. *See* Tex.R. App.P. 74(f); *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 810 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). Therefore, point three is overruled to the extent it attacks the finding in subparagraph 3.

620 S.W.2d 619, 624 (Tex.Civ.App.—Dallas 1981, no writ).

 Compared to the size of Betty's separate estate when they married, Herbert's separate property was insignificant. Moreover, the evidence indicated that during their marriage the parties lived off of Betty's separate estate and the income produced by it. Understanding the equities between the parties, the court still chose to divide the community estate equally. In making an equal division, the court was perhaps influenced by this provision in the premarital agreement:

> In the event the parties' marriage is dissolved by divorce or annulment by any Court, … each party is to retain as his or her separate property the property identified as his or her separate property in this agreement. *All community property is divided equally between the parties according to its value.* To effectuate this provision, husband and wife relinquish and disclaim any right that they may have to seek a division of the property other than in accordance with this paragraph, and agree to indemnify the other for the value of any property that may be awarded by a Court in excess of the value that would result if the division were in accordance with this paragraph.

(Emphasis added).

Instead of $32,259 as found by the jury, the community estate had a value of $115,164.35, a difference of $82,905.35. Considering the magnitude of the error, the equal division made by the court after considering the equities between the parties, and the provision in the premarital agreement, one cannot reasonably conclude that, had the property been correctly characterized, the court probably would have awarded Herbert only $16,129.50 of the community estate. The error materially affected the property division.

Accordingly, the portion of the judgment granting the divorce is severed from the property division and affirmed. The portion of the judgment relating to the property division is reversed, and that portion of the cause is remanded for the court to make a "just and right" division of the community estate. *See* TEX.FAM.CODE ANN. § 3.63(a) (Vernon Supp.1991).

MEANS, J., not participating.