Walton v. Walton 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-94-169-CV
&
No. 10-94-251-CV

     SUE WALSTON,
                                                                                              Appellant
     v.

     LARRY WALSTON,
                                                                                              Appellee
 

From the 19th District Court
McLennan County, Texas
Trial Court Nos. 92-3724-1 & 94-1348-1
                                                                                                    

O P I N I O N
                                                                                                    

      In these two causes we address Sue Walston's complaints arising out of her divorce from
Larry Walston. She brings eleven points of error in cause number 10-94-169-CV, complaining
that the court failed to enforce a premarital agreement, rendered judgment based on a jury verdict
that characterized property without sufficient support in the evidence, and improperly allocated,
and ordered paid, the parties' debts and liabilities. In cause number 10-94-251-CV she complains
about the court's appointment of a receiver to sell the parties' home under the judgment in the
divorce suit. We will reverse a portion of the court's characterization of the parties' property and
the division of the community estate, but dismiss as moot her appeal from the receivership.
      Sue met Larry when she went to work as an executive secretary for Buffalo Airlines, an
airfreight company operated by Larry. They married January 17, 1986. On the day of the
wedding, they entered into a premarital agreement that had been drafted by a Washington, D.C.,
attorney who specialized in aviation law.


 Larry elected to sell Buffalo Airlines in early 1989 for
roughly $2 million. The parties deposited cash proceeds of $1.525 million from the sale into joint
accounts, and, additionally, a promissory note from the purchaser for $224,000 was made payable
to both Larry and Sue. After paying debts of approximately $515,768, they used $750,000 of the
proceeds to purchase certificates of deposits, in both names, and as the CDs matured, the funds
were used to purchase municipal bonds, again in both names. Over time, portions of the proceeds
were spent on income taxes, debt repayment, plane purchases, living expenses, and various other
expenses.
      At trial, the parties disagreed over the characterization of certain assets. Among the disputed
assets were nine types of municipal bonds, a promissory note, two airplanes, various airplane
parts, a car, electronic equipment, furniture, tools, and a gun and parts collection. By jury
question number one, the court allowed the jury to characterize and value this property.


 The jury placed a total value of $394,975 on the property. It also found that Sue owned 20% of seven types
of the bonds and 50% of one of the planes as her separate property, for a total value of $54,000,
and that Larry owned the rest of the assets as his separate property. The judgment varied from
the jury's characterization of these assets and divided all of the property, except for the $10,000
gun collection, as 20% Sue's separate property and 80% Larry's separate property. The gun
collection was awarded to Larry as 100% his separate property.


 Thus, by the court's division
of the disputed property, Sue owned $76,995 of the assets as her separate property and Larry
owned $307,980 of the assets as his separate property. 
PROPERTY DIVISION (CAUSE NO. 10-94-169-CV)
      In her petition for a divorce, Sue pleaded that the parties' property should be divided
according to the characterization in the agreement. Larry pleaded that the agreement should not
be enforced because it was ambiguous concerning its application upon divorce. Sue attached a
copy of the agreement to her amended petitions and introduced a copy into evidence at the trial. 
During the charge conference, Sue objected to submitting the list of property purchased with the
proceeds from the sale of Buffalo Airways for the jury's characterization because: "All of these
items contained on question number one, about which the jury is now being asked to render an
opinion . . . is contemplated by and covered by the terms and conditions of the premarital
agreement . . . ." 
      After the jury returned the verdict dividing the property between Sue's and Larry's separate
estates, i.e., finding none of the property to be community in character, Sue filed a motion to
disregard the jury's findings and for judgment notwithstanding the verdict. She again argued that
"[t]he question of characterization of the property of the parties as contained in Question No. 1
. . . is governed by . . . the construction of the pre-marital agreement, which is a question of law
for the Court." She also argued in her motion that "[t]he jury finding in regard to characterization
is immaterial and does not govern the characterization of the property because that characterization
is governed, as a matter of law, by the agreement of the parties." She requested that the court
render judgment according to the scheme she set out in the motion to disregard.
      However, the court rendered judgment according to the findings of the jury regarding the
ownership of the property gained from the sale of the airline, with the indicated adjustments. It
did not make an express ruling on the enforceability or interpretation of the premarital agreement. 
Sue requested that the court enter findings of fact and conclusions of law regarding the agreement. 
See Tex. R. Civ. P. 296. When the court failed to file its findings and conclusions timely, she
filed the proper notice of past due findings and conclusions. The court, however, also failed to
respond to this reminder. See id. 297. Additionally, Sue filed a motion for a new trial, again
urging that the court erred by failing to implement the premarital agreement and to divide the
property according to the characterization in the agreement.
Enforcement of the Premarital Agreement
      Sue complains in her first point of error that the court did not divide the assets in accordance
with the agreement and, in point three, that the court failed to make findings relating to the
enforceability of the agreement. The agreement is presumptively enforceable. See Tex. Fam.
Code Ann. § 5.46 (Vernon 1993); Grossman v. Grossman, 799 S.W.2d 511, 513 (Tex.
App.—Corpus Christi 1990, no writ). Larry bore the burden to demonstrate that the agreement
was not enforceable if he desired to avoid its provisions. See id. He attempted to raise the
common-law defense of ambiguity to avoid its effect. See Daniel v. Daniel, 779 S.W.2d 110, 114
(Tex. App.—Houston [1st Dist.] 1989, no writ) (holding that the common-law defenses were not
eliminated by the Family Code); but see Tex. Fam. Code Ann. § 5.46(c) (Vernon Supp. 1995)
(section 5.46 prospectively amended to eliminate the common-law defenses to enforcing a
premarital agreement executed after September 1, 1993). 
      Ambiguity is a question of law to be determined by the court. See Coker v. Coker, 650
S.W.2d 391, 393-94 (Tex. 1983). An agreement is ambiguous "when its meaning is uncertain and
doubtful or it is reasonably susceptible to more than one meaning." Id. at 393. Only if the court
concludes that the agreement is ambiguous must the fact-finder determine the true intent of the
parties. See id. at 393-94. 
      Larry claimed at trial that the agreement is unclear about its effect upon the parties' divorce. 
However, the agreement plainly states that upon a divorce the disposition of "jointly held
property" is to be determined by the "ordinary principles of State law." As a matter of law, then,
the agreement is not ambiguous concerning its effect upon a divorce. Thus, the court erred when
it failed to enforce the premarital agreement between Larry and Sue. Point one is sustained. We
overrule point three because our disposition of point one moots the argument Sue presents in it.
Characterization of Property
      In points two, four, and five, Sue attacks the characterization of property she alleges is subject
to the agreement, claiming that by failing to enforce the agreement the court mischaracterized the
property in its judgment and that the jury's findings characterizing the property are not supported
by legally or factually sufficient evidence. In point six, she claims that the court improperly
divested her of separate property. In points seven and eight, she argues that the jury's verdict and
the court's judgment are not supported by sufficient evidence establishing that the property is part
of Larry's separate estate and not a part of the community estate. To rule on these points, we
must determine how the parties' property is characterized with reference to the premarital
agreement and "ordinary principles" of Texas law. We first apply "ordinary principles" of Texas
law to interpret the meaning of "jointly held property" and "joint interest" to determine how
property subject to the agreement is to be characterized and what property is subject to the
agreement. Then we will examine the evidence to determine if the jury's findings and the court's
conclusions are supported by the evidence. We will confine our discussion to only those assets
that the parties disagree about ownership, i.e., those assets submitted to the jury in jury question
number one.
Characterization Under the Agreement
      "The term ‛joint interest' means joined together in interest, a united interest or an interest
shared in common." Jennings v. Srp, 521 S.W.2d 326, 328 (Tex. Civ. App.—Corpus Christi
1975, no writ); see also Kneisley v. Intertex, Inc., 797 S.W.2d 343, 345 (Tex. App.—Houston
[14th Dist.] 1990, no writ). The deposit of the funds into the joint account had the effect of
divesting the original owner of the exclusive ownership and control of the funds and vesting joint
control and ownership in both parties, i.e., Larry and Sue agreed that the depositing spouse would
make a gift of an ownership interest to the other spouse of any separate-property funds deposited
into their joint accounts. See Kennedy v. Beasley, 606 S.W.2d 1, 4 (Tex. Civ. App.—Houston
[1st Dist.] 1980, writ ref'd n.r.e.); see also Powell v. Powell, 822 S.W.2d 181, 183 (Tex.
App.—Houston [1st Dist.] 1991, writ denied).
      Sue argues that the gift is from the depositing spouse's separate estate to the other spouse's
separate estate. She bases this argument on precedent which holds that a third party cannot make
a gift to the community estate; any gift to the spouses together becomes half owned by each of
their separate estates. See, e.g., Marshall v. Marshall, 735 S.W.2d 587, 598 (Tex. App.—Dallas
1987, writ ref'd n.r.e.); McLemore v. McLemore, 641 S.W.2d 395, 397 (Tex. Civ. App.—Tyler
1982, no writ); see also Tex. Fam. Code Ann. § 5.01(a)(2). However, this rule applies to
spouses also: A spouse may not make a gift to the community estate. See Tittle v. Tittle, 148 Tex.
102, 220 S.W.2d 637 (1949); Matter of Marriage of Thurmond, 888 S.W.2d 269, 273 n.1 (Tex.
App.—Amarillo 1994, writ denied); Celso v. Celso, 864 S.W.2d 652, 655 (Tex. App.—Tyler
1993, no writ). 
      We conclude that the language of the agreement comports with these ordinary principles of
Texas law. The agreement states that the depositing of separate funds into the joint account is a
"voluntary transfer . . . to the other spouse." Thus, the agreement itself contemplates a gift to the
non-depositing spouse, not to the estate they share, i.e., to the spouse's separate estate, not to the
community estate. See Tittle, 220 S.W.2d at 642; Kennedy, 606 S.W.2d at 4. Therefore, under
the agreement, separate property funds deposited in the joint account became 50% Sue's separate
property and 50% Larry's separate property.
Characterization Under Texas Law
      Next, we must determine which of the assets listed in jury question one are properly
characterized with reference to the agreement. The key factor in the agreement is the conversion
of separate property of one spouse into separate property of the other spouse. Thus, the agreement
does not affect property which Texas law determines to be community.
Legal Principles
      Separate property consists of property owned or claimed before marriage, property acquired
during the marriage by gift, devise, or descent, recovery for personal injury, and property
designated as such by agreement; all other property acquired during marriage is community
property. Tex. Fam. Code Ann. §§ 5.01, 5.43, 5.52. Property possessed by either spouse
during or on dissolution of a marriage is presumed to be community property. Tex. Fam. Code
Ann. § 5.02; Cockerham v. Cockerham, 527 S.W.2d 162, 167 (Tex. 1975); Scott v. Scott, 805
S.W.2d 835, 837 (Tex. App.—Waco 1991, writ denied). The presumption can only be rebutted
by clear and convincing evidence showing that specific assets are derived from a spouse's separate
estate. Id. That is, the party asserting a separate-property interest in an asset has the burden of
"tracing" the source of the asset from separate property to the specific asset. Id. When
community and separate property have been so commingled as to make segregation impossible,
the statutory presumption prevails, and all of the property is considered part of the community
estate. McKinley v. McKinley, 496 S.W.2d 540, 543 (Tex. 1973). 
      We apply legal- and factual-sufficiency standards of review to determine if the community-property presumption has been rebutted. In determining whether legally-sufficient evidence rebuts
the presumption, we view the evidence in the light which tends to support the jury's findings and
disregard all evidence and inferences to the contrary. See Weirich v. Weirich, 833 S.W.2d 942,
945 (Tex. 1992). If there is no evidence or merely a scintilla of evidence to support the jury's
findings, we will sustain Sue's challenge. See Juliette Fowler Homes v. Welch Associates, 793
S.W.2d 660, 666 & n.9 (Tex. 1990); Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex.
1983). In reviewing a factual-insufficiency claim, we consider all of the evidence and determine
if the challenged finding is so against the great weight and preponderance of the evidence as to be
manifestly unjust. See Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986). Finally, when
Sue has the burden of proof on an issue, we use the "matter of law" standard of review. See
Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989). To sustain this burden, she must
show that there is no evidence supporting the finding and, then, that her contrary position has been
established as a matter of law. See id.
Characterization of Specific Assets
Municipal Bonds
      Buffalo Airlines issued 100 shares of stock. Initially, Larry owned 40 shares, a second
investor named Lund owned 40 shares, and Larry's father, M.D. Walston, owned the remaining
20 shares. Ultimately, Larry claimed ownership of all 100 shares. Sue conceded at trial that
Larry owned 40 shares before their marriage. However, she claimed that they acquired the other
60 shares during the marriage. Larry conceded that he had acquired the 60 shares after marriage,
but contended that he had obtained them through gifts—40 from Buffalo and 20 from his father. 
If true, 100% of the proceeds from the sale of Buffalo would potentially be covered by the
premarital agreement because property acquired by gift during the course of the marriage is
separate property of the donee. See Tex. Fam. Code Ann. § 5.01(a)(2). However, Larry had
the burden to rebut the community-property presumption by clear and convincing evidence. See
Tex. Fam. Code Ann. § 5.02; Cockerham, 527 S.W.2d at 167; Scott, 805 S.W.2d at 837. We
conclude that he failed to carry this burden. 
      Prior to Larry's and Sue's marriage, Buffalo bought Lund's 40 shares and held them as
treasury stock. Sue introduced Buffalo's corporate minutes, dated July 17, 1987, which reflected
that the board of directors had unanimously voted to "pay Larry W. Walston a stock bonus of 40
shares of Treasury Stock as a reward for the Company's fine performance last year." Thus, Sue
showed that Larry obtained 40 shares as payment for his services to Buffalo after their marriage,
establishing that the 40 shares were community property. See Jensen v. Jensen, 665 S.W.2d 107,
109 (Tex. 1984). Although Larry claimed that he would adduce evidence to rebut these corporate
minutes, the only evidence that he presented was his testimony. We conclude that his testimony
is a mere scintilla of evidence. See Kindred, 650 S.W.2d at 63. Thus, he failed to present
sufficient evidence to rebut the community-property presumption regarding these 40 shares. See
Juliette Fowler Homes, 793 S.W.2d at 666 & n.9; Tex. Fam. Code Ann. § 5.02; Cockerham,
527 S.W.2d at 167; Scott, 805 S.W.2d at 837. 
      Sue claimed that she and Larry purchased M.D. Walston's 20 shares of stock for $75,000
after the sale of Buffalo. She presented wire transfer receipts documenting two transfers to M.D.
Walston, one of $30,000 and a second for $45,000.


 Larry claimed that his father had given the
stock to him. However, the only evidence Larry provided was his testimony; he provide no
objective evidence showing that he received the stock as a gift from his father. Again, we
conclude that Larry provided only a scintilla of evidence that he obtained these 20 shares by gift. 
See Kindred, 650 S.W.2d at 63. Thus, he failed to rebut the community presumption that attached
when he acquired ownership of the shares after his marriage to Sue. Therefore, these 20 shares
were also owned as part of the community estate. See Juliette Fowler Homes, 793 S.W.2d at 666
& n.9; Tex. Fam. Code Ann. § 5.02; Cockerham, 527 S.W.2d at 167; Scott, 805 S.W.2d at 837. 
Thus, we conclude that 40% of the proceeds of the sale of Buffalo Airlines was Larry's separate
property at the time of the sale and the remaining 60% was owned by the community estate.
      As already noted, Buffalo Airlines sold for approximately $2 million.


 Although the sale
closed at the end of February 1989, the buyer began payments with a $100,000 cashier's check
on January 27, 1989, apparently deposited into an account held by Larry and Sue (the 202
account). The buyer made two more cash payments that were wired into another (the 316 account)
joint account—a $475,000 payment on February 28 and a $950,000 payment on March 2. Finally,
on May 19 the buyer executed a promissory note for $224,000, payable to both Larry and Sue. 
Thus, for the sale of Buffalo, they received $1.525 million in cash, of which $1.425 million was
deposited into the 316 joint account, and a $224,000 promissory note.
      After receipt of the last major payment, the parties began withdrawing funds from the 316
account. On March 3 they paid a Buffalo debt from the account in the amount of $200,644.44
and, on March 14, they paid a debt owed by Larry in the amount of $315,124.99. Thus,
$515,769.43 of the cash proceeds in the 316 account were immediately used to pay debts. On the
same day as the second debt payment, March 14, Larry and Sue purchased $750,000 worth of
certificates of deposits, utilizing the money in this joint account.
      Sue testified to these transactions, assisted by a ledger she prepared for trial. She did not
introduce any bank statements or canceled checks to support her testimony, but did introduce the
wire transfer receipts. Wire transfer receipts for the February 28 and March 3 deposits are
included in the record. 
      Larry testified about these transactions, too. He introduced the January 27 cashier's check
and a deposit slip for the 202 account, reflecting a $100,000 deposit on January 30. He also
introduced the February statement from the 316 account, showing the $1.425 million in deposits
and the withdrawals discussed above. 
      The CDs were purchased in both Larry's and Sue's name. As the CDs matured, the funds
were either reinvested in other CDs or used to purchase the municipal bonds on hand at the end
of the marriage. Again, the municipal bonds were purchased in both of their names. Sue's
evidence indicated that the funds from the maturing CDs were actually redeposited into the 316
account just prior to being reinvested in the municipal bonds. Larry testified, however, that the
funds went directly from the CDs into the municipal bonds. According to Sue's testimony, the
first bond purchase occurred on May 30. 
      Neither party presented bank documents which would allow the fact-finder to actually trace
each dollar's path from the purchase of Buffalo Airlines to the municipal bonds on hand at the
dissolution of the marriage. The documentary evidence the parties did supply showed that the 316
account received funds from other sources, for instance, a deposit on March 21, which the bank
statement indicates is an interest payment, and withdrawals for undetermined purposes. 
      Under Texas community-property law, the $1.425 million before its deposit in the 316
account belonged 60% ($855,000) to the community and 40% ($570,000) to Larry's separate
estate. After the money was deposited into the account, the premarital agreement legally
recharacterized the funds so that they were then owned 60% ($855,000) by the community, 20%
($285,000) by Larry's separate estate, and 20% ($285,000) by Sue's separate estate. Because the
316 account contained both separate and community funds, a presumption applies that the first
funds withdrawn were community property. See Welder v. Welder, 794 S.W.2d 420, 433 (Tex.
App.—Corpus Christi 1990, no writ). Thus, the $515,769.43 used to pay debts in March are
presumed to be community funds, reducing the community share of the account to 32.8%
($279,210.57), and increasing Larry's and Sue's separate-property portion to 33.6% each. 
Because the next withdrawal from the account was the $750,000 to pay for CDs, the community
share of the account was exhausted, and the additional $470,789.43 used to purchase the $750,000
in CDs came equally from the parties' separate funds in the account. See id.; Scott, 805 S.W.2d
at 838. Thus, the CDs, when purchased, were 37.2% community, 31.4% Larry's separate
property, and 31.4% Sue's separate property. See Scott, 805 S.W.2d at 838. The bonds
purchased with the proceeds of the CDs were, then, at most, 31.4% Larry's separate property and
31.4% Sue's separate property, with the community claiming at least 37.2% of the bonds' value.
      To preserve their separate-property interest in the bonds, either Larry or Sue had to trace the
separate assets used to purchase the CDs into the bonds. See Tex. Fam. Code Ann. § 5.02;
Cockerham, 527 S.W.2d at 167; Scott, 805 S.W.2d at 837. However, neither one presented
sufficient evidence to segregate the funds used to purchase the bonds into a community share and
a separate-property share. See Juliette Fowler Homes, 793 S.W.2d at 666 & n.9; Kindred, 650
S.W.2d at 63. We conclude that the funds were hopelessly commingled. See McKinley, 496
S.W.2d at 543. Thus, the community-property presumption prevails, and those bonds, which
were purchased with money from the CDs and the 316 account, did not retain any separate-property character. See id. Any contrary conclusion by the jury or the court was not supported
by the evidence. See Juliette Fowler Homes, 793 S.W.2d at 666 & n.9; Kindred, 650 S.W.2d at
63. Thus, the bonds listed as items number three through nine on jury question number one are
100% community property.
      Sue conceded at trial that the El Paso County Junior College bonds and the City of Pearland
bonds were purchased prior to her marriage to Larry. Thus, by concession, they are Larry's
separate property. She admitted that she had no claim to the Pearland bonds. She claimed,
however, that Larry made a gift of one-half of the El Paso County Junior College bonds to her. 
To sustain this claim, Sue had the burden of proving (1) Larry intended to make the gift, (2)
delivery of the property to her, and (3) her acceptance of the gift. See Powell, 822 S.W.2d at 183. 
We conclude that she failed to carry her burden of proof. See Sterner, 767 S.W.2d at 690. Thus,
there is sufficient evidence to support the jury's finding that the bonds listed as numbers 1 and 2
on jury question number one are 100% Larry's separate property.
Vehicles
      The jury found that the car and one of the planes submitted in jury question number one, a
1990 Cadillac and a 1970 Cessna 414, were 100% Larry's separate property. The jury found that
the second plane, a 1967 Cessna 150, was 50% Larry's and 50% Sue's separate property. The
court again deviated from the jury's findings, awarding all three 20% to Sue and 80% to Larry. 
We must examine the evidence to determine if the court's failure to enforce the premarital
agreement resulted in a misharacterization of these assets. 
      Sue testified that the Cadillac was purchased with funds from the 316 joint account. Larry
testified that "a check was written directly for this car," without specifying which account the
money came from. However, he testified that "the bond money came directly to my checking
account; and a check was written directly for this car." Larry failed to identify which "bonds"
were the source of the funds. Apart from Larry's vague testimony, neither party presented any
evidence to rebut the community-property presumption. See Juliette Fowler Homes, 793 S.W.2d
at 666 & n.9; Kindred, 650 S.W.2d at 63. Thus, the Cadillac is properly characterized as 100%
community property. See Tex. Fam. Code Ann. § 5.02; Cockerham, 527 S.W.2d at 167; Scott,
805 S.W.2d at 837.
      Both Larry and Sue testified that the Cessna 414 was purchased immediately after the stock
proceeds were deposited. Sue put into evidence a canceled check, dated March 14, 1989,
representing the purchase price of the airplane. This asset is directly traced to the 316 account
after the transactions involving the debt payments and CD purchases. Thus, because the account
had been drained of community property prior to the purchase of the airplane, the Cessna 414 is
properly characterized by the terms of the premarital agreement as being 50% Larry's separate
property and 50% Sue's separate property. See Scott, 805 S.W.2d at 838; Welder, 794 S.W.2d
at 433.
      The Cessna 150 was purchased in the summer of 1991. Sue claimed that Larry bought the
plane as a gift for her. However, she did not present sufficient evidence to demonstrate as a
matter of law that she obtained the plane as a gift. See Sterner, 767 S.W.2d at 690; Powell, 822
S.W.2d at 183. Larry testified that he bought the plane with a $4,000 separate-property
"credit"—i.e., with money then owed to him by the plane's owner as a result of their business
dealings—and $4,000 of "family money." Thus, Larry alleged that the airplane was 50% his
separate property and 50% community property. However, he stated that the credit "had
accumulated over a year or so period." Thus, the credit was acquired during his marriage to Sue
and was presumptively a community asset. Both Larry and Sue failed to present any evidence
which would support the jury's finding that the airplane was 50% the separate property of each,
nor evidence to support the court's judgment dividing ownership of the plane as 20% Sue's
separate property and 80% Larry's separate property. See Juliette Fowler Homes, 793 S.W.2d
at 666 & n.9; Kindred, 650 S.W.2d at 63. Thus, the community-property presumption prevails,
and the Cessna 150 is 100% community property. See Tex. Fam. Code Ann. § 5.02;
Cockerham, 527 S.W.2d at 167; Scott, 805 S.W.2d at 837. Chattels
      The "chattels" included in jury question one are items 14 through 25 (a computer, a
typewriter, three cellular telephones, airplane parts, a Pratt and Whitney PT6, a glass table with
four chairs, two wing chairs, two file cabinets, a band saw, a table saw, and scaffolding). Larry
testified that these items were property of Buffalo Airlines and were not included in the company's
sale. He presented a letter from the buyer documenting that items 14 through 19 (the computer,
typewriter, three cellular telephones, airplane parts, and Pratt and Whitney PT6) were not being
transferred with the airline's assets. Sue agreed with Larry's testimony. Because these items were
initially the property of Buffalo Airlines but were conveyed to the parties by some method, the
parties acquired ownership of the items during the course of their marriage. Therefore, these
items are presumptively community property. Neither party presented any evidence which tended
to rebut this presumption. See id. Thus, the presumption prevails and these items are owned by
the community estate. See id.
Remaining items
      Only two items in jury question number one have not been addressed: item 13, a "Note
receivable from Lifeline Partners LTD," and item 26, the gun collection. Sue stated that the
Lifeline note derived from a failed contract between Buffalo Airlines and Lifeline. When Buffalo
was sold, the note was excluded from the transaction and conveyed to Larry. Larry concurred in
Sue's description of the source of this item. Thus, like the chattels above, the Lifeline note was
acquired from Buffalo Airline during the course of the marriage and, because neither party
presented sufficient evidence to rebut the presumption, is owned by the community. See id. 
Finally, item 26 is a gun collection. Sue conceded that Larry owned the collection before they
were married, but claimed that he spent approximately $10,000 in funds adding to it during the
marriage. However, she does not challenge the court's awarding the collection to Larry as 100%
his separate property. Thus, we will not consider the disposition of the gun collection in this
appeal.
Disposition of Points Two, Four, Five, Six, Seven, and Eight
      We hold that the evidence mandates the conclusion that the City of Lubbock, City of Austin,
East Central I.S.D., Marble Falls I.S.D., City of San Antonio, City of Rockport, and Ellis County
Water bonds (items 3 through 9) are 100% community property. Likewise, the Cadillac DeVille
(item 10), the Cessna 150 (item 12), the Lifeline note (item 13), and the "chattels" (items 14
through 25) are 100% community property. The Cessna 414 (item 11) is 50% Larry's separate
property and 50% Sue's separate property. Finally, the El Paso County Junior College and the
City of Pearland bonds (items 1 and 2) are 100% Larry's separate property. Because the court
deviated from these characterizations, its judgment is not supported by the evidence. Likewise,
the jury's verdict is not supported by the evidence either. 
      The court's judgment divested Larry of 20% of his separate-property bonds and divested Sue
of her separate-property interest in 30% of the Cessna 414. Because such divestiture is
impermissible, we must reverse the court's judgment dividing these two assets. See Cameron v.
Cameron, 641 S.W.2d 210, 219 (Tex. 1982).
      Of the $384,975 in assets in jury question number one, the court found that $307,980 was
Larry's separate property and $76,995 was Sue's separate property. As we have shown, the
evidence supports only a finding that $75,000 belonged to Larry's separate estate, that $25,000
belonged to Sue's separate estate, and that $284,975 was owned as community property. 
Mischaracterizing community assets as separate property does not necessarily result in reversal. 
See Jacobs v. Jacobs, 687 S.W.2d 731, 733 (Tex. 1985); Scott, 805 S.W.2d 841. Reversal is
mandated only if the error has materially affected the court's "just and right" division of the
community estate. Id. When we seek to determine if the error had this effect, we can consider
what division the court probably would have made if the property had been properly characterized. 
See Scott, 805 S.W.2d at 841-42. 
      The court divided the assets characterized as community property at the trial 50% to Sue and
50% to Larry. Under the judgment the court rendered, the total community estate, as we have
characterized it, is divided 64% to Larry and 36% to Sue. Contrasted with the division of the
community estate at the court's disposal, we conclude that the error in failing to enforce the
premarital agreement and rendering judgment unsupported by the evidence materially affected the
property division. See id. Thus, points two, four, five, six, seven, and eight are sustained. 
Because we have sustained these points, we will reverse the court's property division and remand
the property division to the trial court for redivision.
Division of the Debts
      In point nine, Sue argues that the court abused its discretion in dividing the parties' debts. 
The debts are part of the community estate, and the trial court is charged with dividing that estate
in a "just and right" manner. See Tex. Fam. Code Ann. § 3.63(a); McKnight v. McKnight, 543
S.W.2d 863, 866-67 (Tex. 1976); Vannerson v. Vannerson, 857 S.W.2d 659, 673 (Tex.
App.—Houston [1st Dist.] 1993, writ denied). We cannot reverse only a portion of the division
of the community estate. See Jacobs, 687 S.W.2d at 733. We have found that the court's error
in mischaracterizing the property of the parties affected the "just and right" division of the
community estate and will reverse the court's division. See id. When we remand the property
division to the trial court, we necessarily remand the division of the debts. Thus, point nine is
sustained and the court's division of the parties' debts will also be reversed. 
Payment of the Debts
      Finally, in her last two points in cause number 10-94-169-CV, Sue directly attacks the court's
judgment. She first claims in point ten that the court "erred in its methodology" by requiring that
the parties' debts be repaid immediately. In point eleven, she asserts that the court erred by
requiring that she pay her general debts from the proceeds of the sale of her homestead. However,
before Sue can complain about the court's judgment on appeal, she must have brought the
complaint to the trial court's attention. See Tex. R. App. P. 52(a); Young v. Hodde, 682 S.W.2d
236, 237 (Tex. 1984); Strahan v. Davis, 872 S.W.2d 828, 836-37 (Tex. App.—Waco 1994, writ
denied); Winters v. Arm Refining Co., Inc., 830 S.W.2d 737, 738-39 (Tex. App.—Corpus Christi
1992, writ denied). She did not raise these complaints about the judgment in her Motion to
Disregard Jury Findings, for Judgment Non Obstante Veredicto, and for Judgment on the Verdict,
or her Motion for New Trial. Nor has she, in her brief, pointed out where in the record she raised
the complaints in the trial court. Because she failed to preserve these complaints for appellate
review, we overrule points ten and eleven. See id.
RECEIVERSHIP (CAUSE NUMBER 10-94-251-CV)
      As part of the property division in the divorce decree, the court ordered the parties' homestead
sold and the proceeds distributed 50% to each. Following entry of the final divorce decree, Sue
filed her cost bond but did not post a supersedeas bond. Larry then instituted a partition suit,
seeking to have the homestead sold so that its value could be divided according to the divorce
decree. The court denied Sue's plea in abatement and appointed a receiver to sell the homestead. 
In cause number 10-94-251-CV, Sue complains about that appointment.
      She argues in her first point that the court abused its discretion in appointing the receiver
because the property was not in danger of being lost, removed or materially injured. See Tex.
Civ. Prac. & Rem. Code Ann. § 64.001(b) (Vernon 1986). In her second point she argues that
the court did not have jurisdiction to appoint the receiver. See Tex. Fam. Code Ann. §
3.58(h)(3). 
      During the pendency of cause number 10-94-251-CV, Sue filed three motions for leave to file
a petition for a writ of mandamus, seeking to prohibit the court from continuing with the
receivership. We denied leave to file each time. On February 1, 1995, the receiver sold the
residence. By order dated February 15, the trial court discharged the receiver and closed the
receivership. Our clerk notified the parties on March 28, 1995, that this appeal appeared to be
moot and subject to being dismissed unless one of them could show grounds for continuing it. See
Tex. R. App. P. 60(a)(2), 83.
      A cause is moot when there is no actual controversy between the parties or if the court's
action on the merits cannot affect the rights of the parties. Texas Educ. Agency v. Leeper, 893
S.W.2d 432, 441 (Tex. 1994); VE Corp. v. Ernst & Young, 860 S.W.2d 83, 84 (Tex. 1993). At
this time, the receivership has served its function and has been closed by the trial court; thus, there
is no live controversy between Sue and Larry regarding the now nonexistent receivership. 
      Because no controversy now exists between the parties, any opinion we may render on Sue's
appeal of the receivership would constitute an advisory opinion. See General Land Office v. OXY
U.S.A., Inc., 789 S.W.2d 569, 570 (Tex. 1990). We are constitutionally prohibited from
rendering such opinions. See Tex. Const. art. II, § 1; Speer v. Presbyterian Children's Home,
847 S.W.2d 227, 229 (Tex. 1993). In fact, we "simply have no jurisdiction to render advisory
opinions." See Speer, 847 S.W.2d at 229. Even if an issue remains as to costs, an appeal is
nevertheless moot when the underlying controversy has ended. See Brownsville Sch. D. v.
Brownsville Herald, 831 S.W.2d 537, 539 (Tex. App.—Corpus Christi 1992, no writ); State v.
Gibson Products Co., Inc., 699 S.W.2d 640, 642 (Tex. App.—Waco 1985, no writ). 
      In response to our clerk's letter of March 28, Sue filed a "Motion to Continue Appeal." She
argues in the motion that the trial court acted without jurisdiction when it created the receivership
and thus the acts of the receiver are void. Thus, Sue argues, "[i]f this appeal is heard and a
favorable ruling obtained by [her], then [she] should be able to set aside the void act of the
Receiver conveying her interest in the residence." However, she has not cited any authority to
support her arguments in this motion. 
      Sue invites us to render an opinion on the validity of the court's order when such an opinion
would not be binding on the parties unless a subsequent, entirely new law suit is filed. "The
distinctive feature of an advisory opinion is that it decides an abstract question of law without
binding the parties." Texas Ass'n of Business v. Texas Air Control Bd., 852 S.W.2d 440, 444
(Tex. 1993). Any ruling on Sue's claim that the court acted without jurisdiction would not bind
either party to a course of action. Sue might be able to set aside the sale of the house as an action
based on a void order. However, this appeal involves the appointment of the receiver, not the sale
of the house. Any decision we might render on this cause would merely predict the outcome of
a possible future suit to set aside the receiver's deed under which the house was sold. Under the
circumstances, we reject Sue's arguments regarding the viability of her appeal in cause number
10-94-251-CV.
      Because the controversy is moot, we conclude that we do not have jurisdiction over Sue's
appeal from the order appointing a receiver for the sale of the parties' homestead.
DISPOSITION
      Having sustained Sue's points one, two, and four through nine in cause 10-94-169-CV, we
sever the portion of the judgment declaring the parties separate property interests and dividing
their community property, reverse the court's property disposition, and remand the community
property portion of the cause back to the trial court for a just and right division in light of our
judgment. We render judgment, however, declaring that the Cessna 414 is 50% Larry's separate
property and 50% Sue's separate property, and that the El Paso County Junior College and the
City of Pearland bonds are 100% Larry's separate property. Otherwise, the judgment is affirmed. 
Cause number 10-94-251-CV is dismissed for want of jurisdiction. All prior orders of this court
in cause number 10-94-251-CV are vacated.
 
 
                                                                                 BOB L. THOMAS
                                                                                 Chief Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Cause number 10-94-169-CV, reversed and rendered in part, reversed and remanded in part,           affirmed in part
Cause number 10-94-251-CV, dismissed for want of jurisdiction
Opinion delivered and filed June 14, 1995
Do not publish