**Opinion issued April 18, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-11-00132-CV

_____

**NANCY W. RICHARD, Appellant**

**V.**

**CHARLES DAVID TOWERY, Appellee**

---

**On Appeal from the County Court at Law No. 2**
**Galveston County, Texas**
**Trial Court Case No. 06-FD-2307**

---

## MEMORANDUM OPINION

Nancy Richard challenges the trial court's judgment after a bench trial on her divorce from Charles Towery and the division of their community estate. In six issues, Richard contests the trial court's denial of her motion to strike certain

evidence as a discovery sanction; the trial court's characterization, valuation, and division of various assets; and the procedures employed by the trial court to handle a delay in finalizing the community-estate division due to an outstanding tax matter. We affirm.

## Background

Towery and Richard married in March 2003. Just over three years later, Towery filed a petition for divorce; Richard countersued for divorce. The trial court held a bench trial in 2008 but later set aside its rendition and ordered a new trial. The second bench trial began in April 2009 but was continued pending the resolution of certain tax matters. The trial court entered a final judgment in late 2010, after a two-day rendition hearing.

In the final judgment, the trial court awarded Towery the following property: certain real property; all household furnishings and goods, clothing, jewelry, and personal affects within his sole control; all cash or funds in certain checking, savings, and money market accounts; all stocks, bonds, mutual funds, and securities in certain brokerage and investment accounts; benefits associated with his retirement accounts; various motor vehicles; fifty percent of each of three limited partnership interests; one hundred percent of two limited partnership interests; the Towery Associates and Towery Law Firm business entities; and various season tickets and seat licenses.

2

The trial court awarded Richard the following property: certain real property; all household furnishings and goods, clothing, jewelry, and personal affects within her sole control; all cash or funds in certain checking and savings accounts; all stocks, bonds, mutual funds, and securities in certain brokerage and investment accounts; benefits associated with her retirement, pension, and 401(k) plans; her life insurance policy; certain motor vehicles; fifty percent of each of three limited partnership interests; an eight percent interest in Towery's partnership interest in "the partnership of Southshore/Hwy. 96, Ltd."; the contents of her safety deposit boxes; unclaimed property in the amount of $2,167.96; and all of her interest in any trusts created under the will of Thomas Glenn Richard, including a Morgan Stanley account. The trial court further awarded Richard a judgment of $61,473.68 against Towery for the purpose of a just and right division of the community property.

At Richard's request, the trial court entered the following findings of fact and conclusions of law:

*Findings of Fact*

1.    [Towery] and [Richard] were married on March 8, 2003.

2.    At the time of the filing of this suit, [Towery] had been a domiciliary of Texas for six months and a resident of Galveston County for ninety days.

3.    The marriage of [Towery] and [Richard] has become insupportable because of discord or conflict of personalities that

3

destroys the legitimate ends of the marital relationship and prevents any reasonable expectation of reconciliation.

4.     [Towery] and [Richard] own separate and community property as reflected in the attached Exhibit 1, with the value reflected in Exhibit 1.

5.     The liabilities of the parties are reflected in the attached Exhibit 1. All liabilities are community liabilities.

6.     The tax considerations for each asset to which tax considerations apply are set out in Exhibit 1.

7.     Any finding of fact that is a conclusion of law shall be deemed a conclusion of law.

*Conclusions of Law*

1.     The Original Petition for Divorce filed by [Towery] and the counterclaim for divorce filed by [Richard] are in due form and contain all the allegations required by law.

2.     This Court has jurisdiction of the parties and of the subject matter of this case.

3.     All legal prerequisites to granting a divorce have been met.

4.     The divorce is granted on the ground of insupportability.

5.     In making the determination of a just and right division, the Court took into consideration the factors described in *Murff v. Murff*, 615 S. W.2d 696 (Tex. 1981). The Court also considered taxes as specified in Tex. Fam. Code § 7.008.

6.     The division of the property of [Towery] and [Richard] effected by the final judgment is just and right, having due regard for the rights of each party.

4

Exhibit 1, referenced in and attached to the trial court's findings of fact and conclusions of law, is a joint exhibit filed by the parties in which they stipulate as to the character, value, and award of their community assets, except as to certain items they specifically disputed.

Richard appealed from the trial court's judgment, challenging the trial court's (1) admission of certain documents, (2) determination of Towery's separate assets, (3) assessment of the value of Towery & Associates, (4) "decision to 'freeze' the marital estate and delay rendition of the divorce" for more than nineteen months, and (5) division of assets acquired after April 1, 2009.

## Admission of Documents

In her first issue on appeal, Richard contends that the trial court abused its discretion in denying her motion to exclude certain evidence that, according to Richard, Towery did not timely disclose in discovery. She asserts that Towery's supplemental production of documents twenty-seven days before trial was presumptively untimely under Rule 193.5(b) of the Texas Rules of Civil Procedure and therefore the documents should have been excluded unless Towery demonstrated good cause for the late production or lack of unfair surprise, which Towery did not do. She further asserts that the documents were not cumulative of other evidence and the admission of the documents caused the rendition of an

improper judgment by causing the trial court to mischaracterize certain property as Towery's separate property rather than community property.

Towery responds that his production was not untimely because Richard did not request that the documents be produced in discovery; he produced the documents under Rule 1006 of the Texas Rules of Evidence—governing disclosure of documents underlying summaries—as the documentation underlying his separate property tracing schedule, and he produced the schedule itself two months before trial. According to Towery, even if the requests for production on which Richard relied did cover the documents in question, Towery would not have been obligated to produce the documents pursuant to those requests because Richard did not obtain rulings on Towery's objections to those requests. Towery also contends that Richard was not unfairly surprised by the production of his updated tracing schedules and the underlying documents because Towery disclosed the starting balances for his separate holdings before the first trial of this case and disclosed his proposed division of assets two months before the second trial; his supplemental production twenty-seven days before the second trial merely amended his separate property calculations. Alternatively, Towery responds that the documents were admissible as documents supporting a summary under Rule 1006 of the Texas Rules of Evidence, which does not require that underlying documents be made available thirty days before trial. Finally, Towery responds that Richard's

argument on appeal is waived because it is not the argument she made in her motion to strike in the trial court.

## A. Richard must demonstrate an abuse of discretion and error that probably caused the rendition of a wrong judgment

Whether to admit or exclude evidence and whether to impose discovery sanctions generally are decisions within the trial court's discretion, and the trial court's decision regarding discovery sanctions will be set aside only if the court clearly abused its discretion. *Leax v. Leax*, 305 S.W.3d 22, 32 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *In re J.P.B.,* 180 S.W.3d 570, 575 (Tex. 2005) and *United Bus. Mach., Inc. v. S.W. Bell Media, Inc.*, 817 S.W.2d 120, 122 (Tex. App.—Houston [1st Dist.] 1991, no writ)). To establish a clear abuse of discretion, Richard must show that the trial court's action was arbitrary or unreasonable in light of all the circumstances of the case. *See id.* (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241−42 (Tex. 1985)). "The trial court may consider everything that has occurred during the history of the litigation when determining how to sanction a party." *Id.*

Moreover, to obtain reversal of the trial court's judgment based on error in the admission or exclusion of evidence, Richard must show that the trial court's ruling was in error and that the error (1) probably caused the rendition of an improper judgment or (2) probably prevented the appellant from properly presenting the case to the court of appeals. TEX. R. APP. P. 44.1; *Interstate*

7

*Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). "Typically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Interstate Northborough P'ship*, 66 S.W.3d at 220.

**B.      Richard has not demonstrated that the trial court abused its discretion in denying her motion to strike**

In her motion to strike late discovery responses and tracing schedules, Richard asserted that Towery produced updated tracing schedules for his separate assets in supplemental document productions on March 10 and 11, 2009—less than thirty days before the April 2009 trial setting—and that these productions included brokerage and stock statements timely requested by Richard but not previously produced by Towery. Richard attached to her motion to strike her "Interrogatories, Requests for Production and Requests for Disclosure," but did not identify which requests or interrogatories compelled the production of the documents she identified as having been untimely produced. On appeal, Richard relies on request for production number twenty-four and interrogatory number eleven,[1] though she

---

[1]      Interrogatory number eleven states, "In the event you are claiming any property as your separate property, please state each and every item that you claim as separate property and the factual basis that supports your claim that such property is your separate property." Request for production number twenty-four seeks documents "reflecting upon the factual basis of your claim to separate property inquired about in Interrogatory 11 served upon your counsel contemporaneously herewith."

admits that she did not raise these requests before the trial court.[2]

The "Interrogatories, Requests for Production and Requests for Disclosure" that Richard attached to her motion to strike contain fifty requests for production, thirteen interrogatories, and requests for disclosure. Richard did not attach any of Towery's responses to her discovery requests. Nor does the record contain any evidence submitted by Richard to the trial court at the hearing on her motion to strike in April 2009. After filing this appeal, Richard filed Towery's sixth and seventh supplemental responses to her requests for production with the trial court. Although Towery's original responses were not offered into evidence in connection with Richard's motion to strike, they are in the appellate record from an earlier discovery dispute. In his responses to Richard's requests for production, Towery objected to the time and manner of production demanded in Richard's requests and responded that the responsive documents "are voluminous" and that responsive documents "are available for inspection" at Towery's office "during regular business hours, upon reasonable request."

---

[2] Richard also references requests for production numbers seventeen and thirty-three, which she also did not rely on before the trial court. Request for production number seventeen states, "Video tape recordings, motion pictures, photographs, demonstrative evidence or portraits reflecting upon or evidencing any facts involved in this litigation." Request for production number thirty-three states, "All drawings, graphs, charts, photographs, tape or electronic records, and audio/video recordings responsive to the discovery propounded upon you contemporaneously herewith."

9

In March 2008, over a year before the hearing on Richard's motion to strike, Richard filed a motion to compel in which she asserted that Towery's responses to her requests for documentation were incomplete. Pursuant to this motion, the trial court ordered Towery to produce documents responsive to requests for production numbers one, nine, twenty-eight, and twenty-nine by making the responsive documents available in Towery's office for inspection and copying by Richard in May 2008; the trial court otherwise denied Richard's motion to compel. Richard does not appeal the trial court's ruling on her motion to compel, nor does she rely on requests for production number one, nine, twenty-eight, or twenty-nine as requiring production of the documents in question.

At the hearing on Richard's motion to strike, conducted at the start of trial in April 2009, Towery's counsel referenced his objections to her discovery requests and argued that the documents in question had "always been available" at Towery's office for inspection and copying by Richard's counsel. Richard responds on appeal that the tracing schedules were not created until January 2009 and therefore could not have been available for inspection and copying before that date. Towery replies that, regardless of when the tracing schedules were created, the underlying documents that Richard asserts the trial court should have excluded existed before January 2009 and Richard did not provide the trial court with any evidence that those documents were not available for inspection and copying as

10

provided in Towery's discovery responses. The tracing schedules, Towery states, were never requested in discovery and were filed with the trial court in February 2009—two months before trial.

Richard correctly asserts that Towery had a duty to supplement his discovery responses "reasonably promptly" after discovering that his previous responses were no longer complete. *See* TEX. R. CIV. P. 193.5(b). She is also correct that "[a] party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed" unless the trial court finds good cause for the delay or the absence of unfair prejudice to the requesting party. *See* TEX. R. CIV. P. 193.6(a). But, while the burden of demonstrating good cause and a lack of prejudice is on Towery, that burden—and rule 193.6's exclusionary sanction—is only implicated if Richard first establishes that Towery had an obligation to produce the complained-of documents in discovery. *See* TEX. R. CIV. P. 193.6(b). Specifically, Richard had the burden to show that the documents were relevant and responsive to one or more of her discovery requests and if the relevant discovery requests were the subject of a proper objection, to obtain a ruling on the objection or order compelling discovery. *See, e.g.*, *In re Marriage of Bivins*, No. 10-11-00018-CV, 2012 WL 6099066, at *8 (Tex. App.—Waco Dec. 6, 2012, pet. denied) ("Where there are objections to discovery, the party seeking discovery can either file a

11

Motion to Compel or seek a ruling on objections. The requestor waives the failure to produce documents when there is no ruling on the objections.") (citing *Pace v. Jordan,* 999 S.W.2d 615, 622 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)); *Balay v. Gamble*, No. 01-10-00017-CV, 2011 WL 2435929, at *6 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (mem. op.) ("When a party receives objections to its discovery, its failure to seek a ruling on those objections waives its right to the requested discovery. A party cannot sit on an objection and then seek exclusion of the evidence at trial.") (citations omitted).

The trial court determined that Richard did not satisfy her burden. Assuming that the documents at issue fell within one or more of her requests for production, Richard did not identify those requests for the trial court, she did not obtain a ruling on Towery's objections to those requests, and she did not demonstrate that the documents were not available to her at Towery's office as provided for in Towery's discovery response. On this record, we cannot conclude that the trial court's determination constituted an abuse of discretion. *See, e.g.*, *In re Marriage of Bivins*, 2012 WL 6099066, at *8 (overruling challenge to trial court's admission of attorney's fees evidence not produced in discovery when non-producing party had objected to discovery requests and requesting-party had not obtained ruling on objection); *Fourth & Frankford Sonic, Ltd. v. Brown*, No. 07-09-0379-CV, 2011 WL 6846197, at *7 (Tex. App.—Amarillo Dec. 28, 2011, no pet.) (mem. op.)

12

("[B]ecause [appellant] never challenged the validity of [appellee's discovery] replies below, we cannot say whether the trial court erred in admitting evidence . . . . This is so because if the [discovery] replies were legitimate (an issue we do not decide), [appellee] was not obligated to provide the information. And, if she was not obligated to provide it, she cannot be punished for failing to provide it. So, [appellant] failed to build the requisite foundation upon which we could address its complaint on appeal, and we overrule the issue.") (citing *McKinney v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 772 S.W.2d 72, 75 (Tex. 1989), for proposition that party securing discovery has burden to request hearing upon objections urged by opponent); *see also Mandell v. Mandell*, 214 S.W.3d 682, 691 (Tex. App.— Houston [14th Dist.] 2007, no pet.) (holding that appellant waived complaint about untimely supplementation of discovery responses by refusing to accept supplemental production and failing to obtain ruling compelling production); *Langley v. Comm'n for Lawyer Discipline*, 191 S.W.3d 913, 915 (Tex. App.— Dallas 2006, no pet.) (holding that appellate court "cannot say the trial court abused its discretion" in refusing to exclude documents not produced in discovery when record did not contain relevant discovery requests); *Norwest Mortg., Inc. v. Salinas*, 999 S.W.2d 846, 862 (Tex. App.—Corpus Christi 1999, pet. denied) (holding that appellant waived right to exclude evidence on basis of incomplete disclosure when appellant failed to file motion to compel).

13

We overrule Richard's first issue.

## Sufficiency of the Evidence

Richard contends that the evidence is legally and factually insufficient to support the trial court's findings regarding Towery's separate property even if the documents discussed above were properly admitted. Richard indicates that Towery's tracing of separate property is unreliable for several reasons. Although she does not appeal from any expert challenge to Towery's tracing testimony and exhibits, Richard asserts that Towery, who is a licensed attorney and a certified accountant, lacked training, experience, and knowledge in how to perform such tracing. Richard also contends that Towery's tracing schedules are defective and not supported by sufficient underlying documentation and that, in the absence of corroborating tracing schedules, Towery's testimony as to his separate assets is not sufficient to carry his burden of proof.

Towery responds that Richard's attacks on the methodology he used in his tracing schedules are waived because Richard did not object to those exhibits on that basis. He also asserts that Richard judicially admitted to most of his separate property through sworn inventories. According to Towery, the cases on which Richard relies do not apply because they are cases in which the party claiming separate property failed to trace the funds at all or because the tracing evidence was entirely deficient, neither of which is true here; he further states that while

14

those cases involved a lack of tracing evidence, Richard challenges the methodology of the tracing performed by Towery. Finally, Towery challenges the application of the cases on which Richard relies for the contention that one spouse's unsupported testimony cannot satisfy the burden of proving separate property, noting that courts have held that tracing sheets like the one he presented at trial constitute supporting evidence.

**A.  Richard must show that the trial court erred in its characterization of the property at issue and that the error caused the trial court to abuse its discretion in dividing the estate**

The trial court has wide discretion in dividing the marital estate. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). We presume the trial court exercised its discretion properly, and we review the trial court's determinations under an abuse of discretion standard. *Id.*; *Vannerson v. Vannerson*, 857 S.W.2d 659, 668 (Tex. App.—Houston [1st Dist.] 1993, writ denied). The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but rather, whether the court acted arbitrarily or unreasonably. *Vannerson*, 857 S.W.2d at 668 (citing *Downer*, 701 S.W.2d at 241–42). In dividing the estate of the parties, the trial court shall order a division of the property "that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM. CODE ANN. § 7.001 (West 2006). "It is the duty of this Court to indulge every reasonable presumption in

15

favor of the proper exercise of discretion by the trial court in dividing the community estate," and we "will correct the trial court's division of marital property only when an abuse of discretion has been shown." *Vannerson*, 857 S.W.2d at 668 (citing *Murff*, 615 S.W.2d at 698, and *Massey v. Massey*, 807 S.W.2d 391, 398 (Tex. App.—Houston [1st Dist.] 1991, writ denied)).

Property possessed by either spouse on dissolution of marriage is presumed to be community property. TEX. FAM. CODE ANN. § 3.003 (West 2006). A spouse claiming certain property as separate rather than community property must trace and clearly identify the property claimed to be separate. *Zagorski v. Zagorski,* 116 S.W.3d 309, 316 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). In reviewing a challenge to a trial court's characterization of property as separate property, we utilize a two-pronged approach: we determine first whether the trial court's finding of separate property is supported by clear and convincing evidence and if it is not, whether the characterization error caused the trial court to abuse its discretion in the overall division of the community estate. *Viera v. Viera*, 331 S.W.3d 195, 207 (Tex. App.—El Paso 2011, no pet.). Thus, Richard must first establish error by challenging the legal or factual sufficiency of the evidence to support the separate property characterization, and must then conduct a harm analysis showing that because of the mischaracterization, the overall division of the property constitutes an abuse of discretion. *See id.*

16

**B. Richard has not shown that the trial court erred in its characterization of the property at issue**

Towery claimed separate property within fourteen investment accounts held in his name. In her brief, Richard states that she "stipulate[ed] to [Towery's] tracing on all [of these] accounts but SMH 2422 and RJ 7892." We therefore review the sufficiency of the evidence to support the trial court's determination of the separate property in these accounts.[3]

**1. Sanders Morris Harris account**

The SMH Capital Account ending in 2422 is item number thirteen on the parties' joint Exhibit 1. Richard and Towery stipulated that certain holdings in that account were community property and divided them as agreed.[4] Towery claimed that certain holdings in the account were his separate property, including interests in GRT Inc., Genesis Energy, Global Entertainment Corp., Orchard Enterprises, Sports Express, Corporate Opportunity Fund, SMH Quodd, SMH Lombardi, SMH Private Group Equity I and II, Lombardi Series B, and SMH Protons. Richard's

---

[3] In her briefing, Richard states that her stipulations were "based exclusively on" the purportedly late-produced documents discussed above and that "[i]f this Court agrees that the schedules were admitted in error, then [Richard's] stipulations should be rendered ineffective." Because we have overruled Richard's issue regarding the trial court's admission of documents, we need not consider her request to set aside her stipulations regarding Towery's separate property.

[4] In connection with the SMH account, there is an interest in a baseball. This interest was treated as community property pursuant to the parties' agreement in joint Exhibit 1 and is therefore not discussed here.

sworn inventories indicate that she initially agreed with Towery's claimed separate property in the SMH account, but at the time of the second trial, Richard contended that the interests in the account had been comingled and could not reliably be separated into separate property.

Towery testified at trial that the SMH account included three types of investments: money market, stocks, and partnership interest. He testified that the money market accounts were in a sub-account in his name but that the other investments were in the name of Sanders Morris Harris. With respect to the partnership interests, he stated that Sanders Morris Harris "will form a partnership to purchase an interest in a partnership that will joint venture with other investment bank firms." With regard to his tracing of separate property and proceeds from the sale of separate and community property within the account, Towery testified that when an interest was purchased with both community and separate funds, he treated the proceeds from a subsequent sale of that interest as separate and community property on a pro rata basis based on the purchasing funds.

Both parties filed inventories before trial that related to the SMH account. In his February 2009 affidavit, Towery swore that $647,719.42 in the SMH account was his separate property; Towery attached to his affidavit Exhibit 11, which included (1) an itemized list of each asset in the account, what portion of the asset was attributable to the community estate, and what portion of the asset was

18

Towery's separate property; (2) an analysis of each cash transaction for the account from March 2003 through December 2008; and (3) an analysis of each stock purchase and sale for the account from March 2003 through December 2008.

Financial records from Sanders Morris Harris presented at trial show the following. At the end of February 2003, before Towery and Richard's marriage in March 2003, the value of the SMH account was $521,610.70. Towery testified that the cash balance in the account at that time was $114,000 and that he used that money to purchase stocks during the marriage. April 2008 statements for the SMH account shows that the account holdings at that time included the following interests purchased before Towery and Richard's marriage:

- 2,000 shares[5] in Netversant Solutions Inc., purchased in March and November 2000;

- 105.319 shares in Waste Services, purchased in February 2002;

- 100,000 shares in Corporate Opportunity Fund, purchased in December 1998;

- 0.544 shares in SMH Lombardi, purchased in October 2000;

- One share in SMH Wayport LLC, purchased in January 2001;

---

[5] The parties used the term "shares" in their testimony and documents as a generic term to describe ownership interests in various entities, without specifically identifying whether the "shares" are actually references to shares of stock in a corporation, membership interests in a limited liability company, or other kinds of ownership interests. We therefore use the term "shares" in the same broad manner here. We also use the term "purchase" broadly, recognizing that the interests at issue may have been obtained through another type of transaction.

19

- 1,250 shares in SMH Lombardi Series B, purchased in June 2002; and

- 50,000 shares in SMH Protons LLC, purchased in December 2002.

The Corporate Opportunity Fund, SMH Lombardi Series B, SMH Lombardi, and SMH Protons interests remained in the account at the time of trial and remained Towery's separate property. *See* TEX. FAM. CODE ANN. § 3.001(1) (providing that property "owned or claimed by the spouse before marriage" is that spouse's separate property).

The financial documents indicate Towery's separate interests in Netversant Solutions, Waste Services, and SMH Wayport were sold, in whole or in part, before the divorce. The Netversant Solutions interest was sold in December 2008 for a loss of $3.50. The SMH Wayport interest was sold in December 2008 for $25,875.02. The Waste Services interest was supplemented and diminished as discussed below. The proceeds from the sales of this separate property are also Towery's separate property, if properly traced. *See, e.g.*, *Pace v. Pace*, 160 S.W.3d 706, 715 (Tex. App.—Dallas 2005, pet. denied) (stating that "proceeds from the sale of separate property are the separate property of the spouse whose property was sold"); *Scott v. Scott*, 805 S.W.2d 835, 838 (Tex. App.—Waco 1991, writ denied) (stating that proceeds from sale of separate property retain their separate character).

20

In addition to the separate property owned by Towery before the marriage and still held in the SMH account in April 2008, Towery's exhibits show that the account contained the following separate property interests owned by Towery before the marriage but sold before April 2008: American Equity Investment Life, Capital Title Group, General Waste Corp, Indx Software, Waste Corp America, SMH Ceri II, SMH Ceri, Environmental Opportunity Fund, Environmental Opportunity Fund II, Hearthside Invt Partners II, SMH Index II, SMH Hostcentric, SMH Agency, and SMM Champion. According to Towery's documents, these shares were sold or otherwise disposed of as follows. The 2,000 shares in SMH Ceri owned by Towery before he married Richard were converted to 10,000 shares in Capital Environmental Resources Common in September 2003; in February 2004, Towery's SMH Ceri II interest also converted into Capital Environmental Resources Common; Towery received 5,416 additional shares in Capital Environmental Resources Common from his interests in Environmental Opportunity Fund and Ceri II. In August 2004, the 15,416 shares in Capital Environmental Resources Common became 15,416 shares in Waste Services Inc. The American Equity Investment Life interest was sold in three transactions: (1) 3,000 shares in April 2004 for $36,892.03, (2) 2,000 shares in April 2005 for $24,935.04, and (3) 4,000 shares December 2005 for $49,341.81. The Capital Title Group interest was sold in two transactions: (1) 8,000 shares on May 12, 2003 for

21

$24,546.35 and (2) 10,519 shares on May 28, 2003 for $41,694.01. The General Waste Corp interest was sold in July 2007 for $23.80. The Indx Software interest was sold in January 2004 for $14,213.43. The Hearthside Invt Partners II interest was sold in March 2006 for $14,250. The SMH Index II interest was sold in March 2005 for $1,641.93. The SMM Champion interest was sold in January 2006 for $177,199.19.

As noted above, the proceeds from the sales of Towery's separate property are also Towery's separate property, so long as Towery properly traces the transactions. *See, e.g.*, *Pace*, 160 S.W.3d at 715; *Scott*, 805 S.W.2d at 838. And, if properly traced, property purchased with such proceeds is likewise Towery's separate property. *See Pace*, 160 S.W.3d at 715; *Scott*, 805 S.W.2d at 838; *Ridgell v. Ridgell*, 960 S.W.2d 144, 150 (Tex. App.—Corpus Christi 1997, no pet.) (noting that when proceeds from sale of separate property were used to pay off other property, "separate property begat separate property"). In his tracing schedules, Towery treated the proceeds from the sales of separate property discussed above as his separate property and treated the property purchased with the separate funds in the account—including funds in the account before the marriage and funds resulting from the sale of separate property in the account—as separate property on a pro rata basis.

22

Towery's tracing exhibits follow his separate funds through various purchases and sales, including the following purchases:

- $25,000 in separate funds to purchase 4,000 shares in Sports Express LLC in September 2004;

- $50,000 in separate funds to purchase 50 shares in SMH Private Equity Group I in December 2004;

- $33,326.40 in separate funds and $19,673.60 in community funds to purchase 20,000 shares in Dune Energy in January 2006;

- $47,604.50 in separate funds to purchase 10,000 shares in Regent Communications in January 2006;

- $19,504.50 in separate funds to purchase 2,000 shares in Orchard Enterprises, formerly known as Digital Music Group, in February 2006, which were the subject of a reverse split in November 2007, resulting in ownership of 666 shares;

- $50,025 in separate funds to purchase 8,700 shares in Global Entertainment Corp. in April 2006;

- $63,033.50 in separate funds to purchase 5,000 shares in Luby's Inc. in April 2006, followed by three more purchases of Luby's Inc. shares: (1) $6,067.30 in separate funds to purchase 500 shares, (2) $5,907.45 in community funds to purchase another 500 shares in May 2006, and (3) and $36,364.50 in separate funds to purchase another 4,000 shares in January 2008;

- $35,788.50 in separate funds and $9,211.50 in community funds to purchase 30,000 shares in Gran Tierra in June 2006, followed by another purchase of 15,000 shares in Gran Tierra in August 2008 using $15,567.30 in separate funds and $182.70 in community funds;

- $19,500 in separate funds and $5,500 in community funds to purchase 50 shares in SMH Private Equity Group II in August 2006;

- $33,794.07 in separate funds and $3,922.53 in community funds to purchase 3,000 shares in Sanders Morris Harris Group in September 2006;

- $35,247.45 in separate funds and $7.05 in community funds to purchase 15,000 shares in Endeavour Intl Corp. in October 2006, followed by a purchase of another 20,000 shares in April 2008 using $18,801.19 in separate funds and $7,551.31 in community funds;

- $50,000 in separate funds to purchase 50 shares in SMH Quodd in May 2007;

- $10,713.21 in separate funds and $4,291.29 in community funds to purchase 1,000 shares in Main Street Cap Corp. in October 2007, $330 in separate funds to purchase 23.061 shares in Main Street Cap Corp. in December 2007, $347.84 in community funds to purchase another 25.298 shares in March 2008, $366.93 in community funds to purchase 25.578 shares in June 2008, $386.62 in community funds to purchase 27.736 shares in September 2008, $137.71 in community funds to purchase 11.479 shares in October 2008, $139.14 in community funds to purchase 12.253 shares in November 2008, $140.67 in community funds to purchase 13.399 shares in December 2008, $142.35 in community funds to purchase 14.423 shares in January 2009, $144.15 in separate funds to purchase 14.232 shares in February 2009, and $145.93 in separate funds to purchase 15.129 shares in March 2009;

- $3,743.12 in separate funds and $17,324.12 in community funds to purchase 20,000 shares in KMG Chemicals in January 2008;

- $37,842.30 in separate funds to purchase 2,000 shares in Genesis Energy LP in August 2008;

- $14,667.26 in separate funds and $837.24 in community funds to purchase 5,000 shares in WCA Waste Corp. in November 2008; and

- $44,262.29 in separate funds and $474.21 in community funds to purchase 5,000 shares in Southwest Airlines Co. in January 2009;

Additionally, the GRT interest in the SMH account was received from the Environmental Opportunities Fund in March 2007.

According to Towery's documents, subsequent transactions affecting these separate or partially-separate property interests include the following: a short sale on WCA Waste Corp in May 2004 which netted $46,906.26 in separate funds and $1,375.99 in community funds; a sale of 1,700 shares in Waste Services Inc. in October 2007, netting $15,825.25 in separate funds; a sale of 10,000 shares in Gran Tierra Energy in February 2008, netting $30,547.53 in separate funds and $7,862.54 in community funds; a sale of another 10,000 shares in Gran Tierra Energy in June 2008, netting $66,937.70 in separate funds and $17,218.32 in community funds; and a sale of 2,500 shares in Endeavor in October 2005, netting $9,516.84 in separate funds.

In her inventories, Richard did not itemize the SMH account or segregate its holdings or sub-accounts; she treated it as a single inventory item. In her inventory showing an adjustment date in July 2008, Richard represented that the SMH account had a value of $516,106.27 at the time of the marriage and that the community interest in the account was the account's value at the time of the inventory's accounting less its value at the time of marriage ($516,106.27). In her January 2009 and February 2009 inventories, Richard made the same representation regarding the amount in the account at the time of marriage and again stated that the community's interest in the account excluded that amount. In her April 5, 2009 amended inventory with proposed division of assets and

liabilities, filed with the trial court on April 6, 2009, Richard again made the same representations regarding the account and also specifically identified $516,106.27 of the funds in the account as "separate property of [Towery.]" Richard filed a verification in which she swore that the representations in her amended inventory and proposed division of assets and liabilities were true and correct. But in her April 6, 2009 amended inventory with proposed division of assets and liabilities— which she filed with the trial court on April 7, 2009, after commencement of the April 2009 trial—Richard swore for the first time that Towery's separate property in the account was $0. She filed a verification in which she swore that the representations in the new amended inventory and proposed division of assets and liabilities were true and correct.

According to the trial court's findings of fact and conclusions of law, the following interests in the SMH account were the separate property of Towery: all of GRT Inc, all of Genesis Energy, all of Global Entertainment Corp., all of Orchard Enterprises, all of Sports Express, all of Corporate Opportunity Fund, all of SMH Quodd, all of SMH Lombardi, all of SMH Private Group Equity I, all of SMH Lombardi Series B, all of SMH Protons, 62.88% of Dune Energy, 83.62% of Endeavour Intl, 98.84% of Gran Tierra, 17.9% of KMG Chemicals, 95% of Luby's Inc., 64.81% of Main Street Capital, 89.6% of Sanders Morris Harris Group, 98.94% of Southwest Airlines, 94.6% of WCA Waste Corp, 54.66% of Waste

26

Services Inc., 78% of SMH Private Equity Group II. These findings are consistent with Towery's testimony and exhibits.

We note that the percentages calculated by trial court need not be perfect—minor variances in the math, if any, do not amount to reversible error as long as they are not material in light of the community estate as whole. When an appellant asserts that the trial court has mischaracterized property, we remand the entire community estate for a new division only if the trial court's error, if any, materially affects the trial court's just and right division of the community estate on the whole; reversal is not necessary if a mischaracterization of property has only a *de minimis* effect on the trial court's just and right division. *See, e.g.*, *Monroe v. Monroe*, 358 S.W.3d 711, 718 (Tex. App.—San Antonio 2011, pet. denied) ("Even though the jewelry was separate property, we remand the entire community estate for a new division only if '[we] it find[ ] reversible error in a specific part of the division that materially affects the trial court's just and right division of the *entire* community estate.' Reversal is not required if the mischaracterization of property has only a *de minimis* effect on the trial court's just and right division.") (quoting *Grossnickle v. Grossnickle*, 935 S.W.2d 830, 836 (Tex. App.—Texarkana 1996, writ denied) (emphasis added)); *Graves v. Tomlinson*, 329 S.W.3d 128, 153−54 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (reversing and remanding for new division when trial court's mischaracterization of $134,000 in community

property as separate property had "more than a *de minimis* effect on the trial court's just and right division" and "materially affected the court's just and right property division"). "Mathematical precision in dividing property in a divorce is usually not possible." *Murff*, 615 S.W.2d at 700.

Under the circumstances of this case, giving due regard for the trial court's role as the finder of fact, Richard has not demonstrated that the evidence was legally or factually insufficient to support the trial court's conclusions regarding the separate nature of this property. *See Sink v. Sink*, 364 S.W.3d 340, 344–45 (Tex. App.—Dallas 2012, no pet.) ("Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. Separate property will retain its character through a series of exchanges so long as the party asserting separate ownership can overcome the presumption of community property by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character.") (citations omitted); *Pelzig v. Berkebile*, 931 S.W.2d 398, 402 (Tex. App.—Corpus Christi 1996, no writ) ("In evaluating the trial court's findings of fact, we must give substantial deference to the trial court's determination of the weight and credibility of the evidence, and only disturb the trial court's findings in a case of clear abuse.") (citing *Murff*, 615 S.W.2d at 700).

## 2.     Raymond James account

The Raymond James account ending in 7892 is item number seventeen on the parties' joint Exhibit 1. Richard and Towery stipulated that certain holdings in that account were community property and divided them as agreed. Towery claimed that certain holdings in the account were his separate property, including interests in "Berkshire Hathaway" and "El Paso Pipeline Partners." He testified that he owned the Berkshire Hathaway investment before he married Richard. He also claimed 49% of the cash in the account as his separate property.

Both parties filed inventories before trial that related to the Raymond James account. In his February 2009 affidavit, Towery swore that his separate property in the Raymond James account was $144,893.33 as of December 31, 2008. Towery attached to his affidavit Exhibit 13, which included (1) an itemized list of each equity in the account, the number of shares of each equity attributable to the community estate, and the number of shares of each equity that was Towery's separate property; (2) an analysis of each cash transaction for the account from March 2003 through December 2008; and (3) an analysis of each stock purchase and sale for the account from March 2003 through December 2008. Towery identified the following shares as his separate property: 10 of 10 Berkshire Hathaway shares, 300 of 300 El Paso Pipeline Partners LP shares, 65 of 200 Williams Pipeline Partners shares, and 2,350 of 2,500 Whiting USA shares.

29

The analysis of share purchases and sales shows:

- The 10 Berkshire Hathaway shares were purchased in February 2000, before Towery married Richard, and were still owned by Towery as of December 31, 2008;

- The 300 El Paso Pipeline Partners LP shares were purchased in November 2007 using $6,004 in separate funds and $0 in community funds;

- The 200 Williams Pipeline Partners shares were purchased in January 2008 using $2,702.70 in community funds and $1,301.30 in separate funds, for a total purchase price of $4,004; and

- The 2,500 Whiting USA shares were purchased in April 2008 using $3,000.24 in community funds and $47.003.76 in separate funds, for a total purchase price of $50,004.

If Towery's representation as to the time of purchase is credited, the Berkshire Hathaway shares are his separate property, as represented in Towery's affidavit. If Towery's representations regarding the purchasing funds are credited, 300 of the El Paso Pipeline Partners LP shares, 65 of the Williams Pipeline Partners shares, and 2,350 of the Whiting USA shares are Towery's separate property, as represented in Towery's affidavit.

Raymond James financial statements presented at trial demonstrated that the balance in the Raymond James account at the end of February 2003, before Richard and Towery married in March 2003, was $186,652.89, including $114,624.14 in "cash/cash equivalents," $23,928.75 in "equities/options," and $48,100 in "REIT's/Tangibles." According to Towery's tracing schedule and

exhibits, the Raymond James account included the following separate property, in addition to the Berkshire Hathaway shares, before Towery and Richard married in February of 2003: 100 shares of Kraft Foods, 2,050 shares of Marex, 20,500 shares of Vigilant Applied Technologies, and 2,000 shares of Crosstex Energy LP. All of these shares were sold out of the account between February 2003 and the time of divorce. Towery's tracing exhibits treat the income from those sales as his separate property and trace the separate funds through various stock purchases and sales, including the $6,004 purchase of the El Paso Pipeline Partners LP shares in November 2007, the $1,301.30 purchase of 65 Williams Pipeline Partners shares in January 2008, and the $47.003.76 purchase of 2,350 Whiting USA shares in April 2008. *See Sink*, 364 S.W.3d at 344–45.

In her inventories, Richard did not itemize the Raymond James account or segregate its holdings; she treated it as one inventory item. In her inventory showing an adjustment date of July 2008, Richard represented that the account had a value of $186,652.89 at the time of the marriage and that the community interest in the account was the account's value at the time of the inventory's accounting less its value at the time of marriage ($186,652.89). In her January 2009 and February 2009 inventories, Richard made the same representation regarding the account balance at the time of marriage and again stated that the community's interest in the account excluded that amount. In her April 5, 2009 amended

31

inventory with proposed division of assets and liabilities, filed with the trial court on April 6, 2009, Richard again made the same representations regarding the account and also specifically identified $186,652.89 of the funds in the account as "separate property of [Towery.]" Richard filed a verification in which she swore that the representations in her amended inventory and proposed division of assets and liabilities were true and correct. But in her April 6, 2009 amended inventory with proposed division of assets and liabilities, filed with the trial court after commencement of the April trial, Richard swore for the first time that Towery's separate property in the account was $0. She filed a verification in which she swore that the representations in the new amended inventory and proposed division of assets and liabilities were true and correct.

According to the trial court's findings of fact and conclusions of law, the following interests in the Raymond James account were the separate property of Towery: 49% of the cash, all 10 Berkshire Hathaway shares, all 300 El Paso Pipeline Partners shares, 32.5% of the Williams Pipeline Partners shares (or 65 of 200 shares), and 94% of the Whiting USA shares (2,350 of 2,500). These findings generally are consistent with Towery's testimony and exhibits. Again, the percentages calculated at trial need not be perfect, so long as any variances are minor and immaterial in light of the community estate as whole. *See, e.g.*, *Monroe*, 358 S.W.3d at 718 (quoting *Grossnickle*, 935 S.W.2d at 836); *Graves*, 329 S.W.3d

32

at 153−54. Under the circumstances of this case, giving due regard for the trial court's role a finder of fact, Richard has not demonstrated that the evidence was legally or factually insufficient to support the trial court's conclusions regarding the separate nature of this property. *See Sink*, 364 S.W.3d at 344–45; *see also Pelzig*, 931 S.W.2d at 402 (citing *Murff*, 615 S.W.2d at 700).

Moreover, Richard's complaints on appeal focus largely on Towery's credibility and reliability. With respect to her reliability complaints, Richard did not make a *Daubert* objection at trial, did not object to Towery's tracing methodology at trial, and has not appealed from the trial court's decision to admit Towery's tracing evidence and testimony on any basis other than as a discovery sanction. With respect to her credibility complaints, the determination of the credibility of a witness's testimony and the weight to be given that testimony is an issue entirely within the purview of the trial court. *See, e.g.*, *Zagorski*, 116 S.W.3d at 317−18 ("[W]e do not evaluate the credibility of oral testimony given by Tony, Robert Adams, CPA, Ken Zagorski, and John Rundell about the inception of title to the Account. This court is not permitted to interfere with the fact finder's resolution of conflicts in the evidence or to pass on the weight or credibility of the witnesses' testimony.") (citing *Sprick v. Sprick*, 25 S.W.3d 7, 13 (Tex. App.—El Paso 1999, pet. denied), and *Puri v. Mansukhani*, 973 S.W.2d 701, 711 (Tex. App.—Houston [14th Dist.] 1998, no pet.)). "The credibility of witnesses in a

33

divorce action, including the husband and wife, is solely under the purview of the trial court, not an appellate court." *Id.* at 318 (citing *Bailey v. Bailey*, 295 S.W.2d 438, 439 (Tex. App.—Amarillo 1956, no writ)). We must rely upon the factfinder—here, the trial court—to make findings based upon its belief or disbelief of the testimony before the court. *Carter v. Carter,* 736 S.W.2d 775, 779 (Tex.App.—Houston [14th Dist.] 1987, writ denied). If the trial court found Towery's testimony and tracing to be credible, the trial court could have reasonably formed a firm belief or conviction about the truth of Towery's claim that the assets discussed above were Towery's separate property. *See id.* (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)).

We overrule Richard's second issue.

### Towery & Associates

In her third issue, Richard asserts that the trial court abused its discretion by under-valuing Towery & Associates, Towery's sole proprietorship. Specifically, she asserts that, "[p]ursuant to the trial court's findings, the community property interest in Towery & Associates was valued at a *negative* $490,243.38." Towery responds that Richard misunderstands the trial court's findings; he states that the trial court gave the community estate credit for the value of Towery & Associates' accounts receivable, furniture and fixtures, accounts payables, and accrued pay but also gave Towery an offset against those values based on the value of the separate

34

property accounts receivable and work-in-progress that Towery contributed to Towery & Associates, citing *Schmidt v. Huppman*, 11 S.W. 175, 176 (Tex 1889).

The trial court made the following factual finding with regard to Towery & Associates:

- Towery & Associates had $383,233.35 in accounts receivable on the date of Towery and Richard's marriage and $180,632.81 in accounts receivable as of April 1, 2009, resulting in a $202,540.54 community-property offset for Towery;

- Towery & Associates had $175,391.70 in unbilled time for work in progress on the date of Towery and Richard's marriage and $0 in unbilled time for work in progress as of April 1, 2009, resulting in a $175,391.70 community-property offset for Towery;

- Towery & Associates had $5,000 worth of furniture and fixtures, which was community property;

- Towery & Associates had $22,003.74 in accounts payable as of the March 31, 2009, resulting in a $22,003.74 community-property offset for Towery; and

- Towery & Associates had $95,307.40 in accrued payroll of the March 31, 2009, resulting in a $95,307.40 community-property offset for Towery.

With respect to Towery & Associates' accounts receivable, Richard asserts that Towery "uses pre-marriage accounts receivable from early 2003 in the amount of $383,233 (all of which were [Towery's] separate property) and deducts them from current account receivables as of 3/31/09 to create a 'negative asset' for the community estate of $202,540.54." She continues, "Not only does the record reflect that a substantial portion of the pre-marriage accounts receivable was

35

collected, any remaining receivables from 2003 would be uncollectible in 2009 by the applicable 4 year statute of limitations." But the fact that the accounts receivable were ultimately received by Towery & Associates does not undercut Towery's entitlement to reimbursement or offset; to the contrary, it establishes that Towery & Associates—a community asset—received value for the receivables owned by Towery before the marriage and contributed by Towery to the law firm after the marriage.

The only evidence, which Richard does not controvert, is that these receivables were Towery's separate property and that he contributed them to Towery & Associates. Towery testified that most of the receivables were collected the month after Towery and Richard married and that the unbilled work was billed on April 1, 2003. Towery also testified that the collected receivables went into Towery & Associates' account, the unbilled work was collected by Towery & Associates, and Towery & Associates had no accounts receivable or unbilled work outstanding at the time of trial. Richard presented no controverting evidence regarding the value of the accounts receivable. The trial court was free to credit Towery's testimony and evidence regarding the amount of the accounts receivable and unbilled work Towery contributed to the community estate—i.e., Towery & Associates, a community asset—and that the community estate benefited from those contributions in that amount.

Richard asserts that "[i]f [Towery] wanted to claim a potential benefit from [the accounts receivable], he was obligated to trace the cash proceeds from these separate collections and thereafter seek reimbursement from the community estate under Tex. Fam. Code §3.402 as limited by §3.409. This kind of 'before and after' tracing generally does not discharge a spouse's burden of proof to clearly trace separate property," citing *Tarver v. Tarver*, 394 S.W.2d 780, 785 (Tex. 1965) and *Smith v. Smith*, 694 S.W.2d 426, 433 (Tex. App.—Tyler 1985, writ ref'd n.r.e.).

We agree that Towery has the burden of proving and tracing his separate property, but we disagree that the trial court abused its discretion in determining that burden was satisfied here. Richard admits that the Towery & Associates' pre-marriage accounts receivable were Towery's separate property, and she does not deny that the accounts receivable were contributed to Towery & Associates during the marriage or that Towery & Associates was community property. Thus, Towery presented evidence that he contributed personal property to the community, for which the trial court gave him an offsetting credit.

Richard's cases do not require a different result. In *Tarver*, the Texas Supreme Court rejected an argument that the law of trusts governed the parties' divorce; instead, the Court applied the general rule that a party claiming separate property bears the burden of tracing the property and required the heirs of one spouse to trace the proceeds of the sale of separate property. *Tarver*, 394 S.W.2d at

37

783–85. In *Smith*, the Tyler Court of Appeals determined that the proceeds of the sale of one spouse's separate property were commingled with community funds and that the parties had "made no attempt to trace or identify any separate property funds of [the spouse] into any financial institution." *Smith*, 694 S.W.2d at 433. Unlike in *Tarver* and *Smith*, Richard's third issue does not relate to proceeds from the sale of separate property which Towery has claimed as his separate property. Instead, Richard's third issue relates to separate assets—accounts receivable and unbilled work—that Towery contributed to the community estate and for which the trial court recognized an offset.

Under these circumstances, we cannot conclude that the trial court abused its discretion in granting Towery offsets in the amounts of Towery & Associates' accounts receivable and unbilled time before Richard and Towery's marriage. These amounts, as Richard recognizes in her brief, were Towery's separate property, which he contributed to a business that was part of the community estate. The trial court was thus within its discretion in allowing Towery offsets for those contributions. *See, e.g.*, *Schmidt*, 11 S.W. at 176 ("Where it satisfactorily appears, as in this case, that one spouse brought into the partnership separate funds invested in a particular business, which business was carried on and the profits arising therefrom used in creating and building up the community estate, and the separate funds are employed in the same business at the dissolution of the partnership, upon

38

settlement with the community estate we think the spouse furnishing such separate funds is entitled to be reimbursed therefor."); *Vallone v. Vallone*, 644 S.W.2d 455, 459 (Tex. 1982) ("A right of reimbursement arises when the funds or assets of one estate are used to benefit or enhance another estate without itself receiving some benefit.").

With respect to Towery & Associates' accounts payable and accrued payroll, Richard asserts that Towery "simply asserts the current amounts owed, not reducing these amounts by any pre-marriage balances that may have existed." Richard's contention suggests that she does not believe Towery's representation that the amount of accounts payable and accrued payroll were $0 at the time of divorce, but she presents no evidence to contradict Towery's $0 assertion. Towery's assertion that Towery & Associates did not have any outstanding balances on these expense accounts at the time of divorce is consistent with his testimony that he recently changed the business model for his practice. Towery testified that he recently negotiated a deal with one of his primary clients under which the client pays all of Towery & Associates business expenses in exchange for certain benefits. The trial court was free to believe Towery's testimony on this issue. *See, e.g.*, *Pelzig*, 931 S.W.2d at 402 (discussing deference to factfinder's determination of credibility issues).

Richard next contends that "[e]ven if a pre-marriage balance for these two items was zero, reductions to the community estate presented by [Towery] and adopted by the trial court are based on unrecognized methodologies and [are] clearly inequitable, especially considering the evidence establishing that [Towery] collected a significant portion of pre-marriage receivables and the disturbing use of 'estimated' current amounts." It is difficult to identify the exact complaint Richard makes regarding Towery's methodology. We cannot see that the trial court's division is inherently unjust in this regard: the trial court distributed 100% of Towery & Associates, a community asset/liability, to Towery but also credited Towery with an offset in the amount of 100% of the entities' debts. Without more, we cannot conclude that the trial court abused its discretion in this regard.

We overrule Richard's third issue.

## The April 1, 2009 Cut-Off

In her fourth issue, Richard asserts that "[t]he trial court's decision to 'freeze' the marital estate and delay rendition of the divorce for more than nineteen (19) months contributed to a division of property which is unjust and the entry of a final judgment that precludes [Richard] from seeking post-divorce relief." In her fifth issue, Richard asserts that the trial court abused its discretion by awarding assets acquired by Towery after April 1, 2009 to Towery. Because both of these

issues relate to the passage of time between the second trial of this action and the court's rendition of final judgment, we address them together here.

After the first trial of this action, the parties discovered "potential IRS issues" that they believed would affect the community estate. Pursuant to the parties' agreement, the trial court set aside the first trial and ordered a new trial. After a second, two-day trial in early April 2009, the parties still needed additional tax information. Towery suggested a mistrial for this reason, but Richard requested that the trial court instead abate the trial until the information was available. The trial court agreed with Richard that abatement was preferable to trying this action a third time. After Richard expressed concern about the disposition of assets and "manipulation" of accounts between the time of the second trial and ultimate disposition, the trial court agreed to use April 1—a date suggested by Richard—as the cutoff date for the community estate and valuation of the parties' assets.

At the November 2010 rendition hearing, Richard and Towery went through a spreadsheet of assets, addressing each disputed item. The hearing record demonstrates that the trial court and both parties were aware of the April 1 cut-off and employed that cut-off in evaluating the parties' assets and liabilities without objection. Richard expressly recognized that Towery had acquired additional assets after the cut-off and did not request that those assets be accounted for in the

distribution of assets; nor did Richard identify assets and liabilities she had incurred since April 1 and request that they be included in the division of assets.

A review of the hearing transcripts indicates that the actions about which Richard complains were taken by the trial court in response to Richard's own requests and concerns, and that Richard participated in the procedure adopted by the trial court without objection. It was, in fact, Richard who suggested the April 1 cut-off date. We have not found, and Richard has not identified, evidence in the record that Richard preserved any complaint relating to these issues for appeal by making a timely and specific objection to the procedure announced by the trial court and by obtaining a ruling on that objection before the trial court entered a final judgment. *See* TEX. R. APP. P. 33.1(a) (stating that, "[a]s a prerequisite to presenting a complaint for appellate review, the record must show" that complaining party made proper, timely, and sufficiently specific objection or request in trial court and obtained ruling); *see also Ahmed v. Shimi Ventures, L.P.*, 99 S.W.3d 682, 684 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (rejecting appellant's objection on appeal to when he "implicitly acquiesced in [the complained-of] procedure below" after having been advised of the procedure and having participated without complaint). To the contrary, Richard raised these complaints for the first time in her motion for new trial.

A motion for new trial is a timely manner of raising certain types of complaints—primarily, complaints (1) "on which evidence must be heard such as one of jury misconduct or newly discovered evidence or failure to set aside a judgment by default," (2) "of factual insufficiency of the evidence to support a jury finding," (3) "that a jury finding is against the overwhelming weight of the evidence," (4) "of inadequacy or excessiveness of the damages found by the jury," and (5) on incurable jury argument; but it is not a timely manner of raising various other types of complaints—for example, complaints relating to jury charge error or a failure to segregate attorney's fees. *See* TEX. R. CIV. P. 324(b) (listing types of error that must be preserved in motion for new trial); *Kirkpatrick v. Mem'l Hosp. of Garland*, 862 S.W.2d 762, 769 (Tex. App.—Dallas 1993, writ denied) ("Objections to the charge in a motion for a new trial are untimely and preserve nothing for review."); *Am. First Nat. Bank v. Jordan-Lewis Dev. L.P.*, No. 01-09-00990-CV, 2011 WL 2732779, at *8 (Tex. App.—Houston [1st Dist.] July 14, 2011, no pet.) (mem. op.) (holding that appellant waived complaint that attorney's fees should have been segregated by raising it for first time in motion for new trial). Unlike complaints relating to jury argument, jury misconduct, or the jury's findings, which may be raised for the first time in a motion for new trial, Richard could have raised her complaints about the trial court's actions here before the verdict/judgment stage of the case. Instead, Richard agreed that a final disposition

43

of the community estate required resolution of the tax issues and requested that the parties be prevented from altering the community estate after April 1.

The purpose of Rule 33.1's requirement that parties preserve error by raising their complaints in the trial court in a timely and specific manner is to promote judicial efficiency by allowing the trial court an opportunity to correct an error. *See Morris v. Aguilar*, 369 S.W.3d 168, 170 n.3 (Tex. 2012); *see also Osterberg v. Peca*, 12 S.W.3d 31, 40 (Tex. 2000); *In re C.O.S.*, 988 S.W.2d 760, 765 (Tex. 1999). That purpose would be disserved if we allowed Richard to complain about the trial court's delay in entering final judgment and use of the April 1 cut-off when: (1) Richard and Towery both agreed that the tax issues needed to be resolved before final judgment issued; (2) Richard opposed Towery's request for a new trial, which would have been the third time the case was tried, and asked the trial court to abate the case until the tax issues could be resolved instead; (3) Richard requested that the trial court protect her from post-trial manipulation of the parties' assets during the abatement period; (4) Richard suggested the trial court use April 1 as the cutoff date for the asset analysis; (5) Richard adopted the April 1 cut-off date in her arguments, did not attempt to have assets she required after that date divided between herself and Towery, and did not object to Towery's adoption of the April 1 cut-off date; and (6) Richard waited until after the close of evidence to raise her complaint, at which time the only remedy available was a third trial of

44

this action—the very outcome that the trial court wished to avoid and that Richard previously asked the trial court not to grant in first instance. We therefore conclude that Towery has not preserved this issue for appellate review.[6] *See In re S.C.S.*, No. 05-06-01600-CV, 2008 WL 1973570, at *3 (Tex. App.—Dallas May 8, 2008, no pet.) (mem. op.) (citing *Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex. App.— Houston [1st Dist.] 1994, writ denied), for proposition that "trial court exercises broad discretion in conducting trials and processing its docket to promote the economical and efficient use of time and effort by itself, counsel, and litigants").

We overrule Richard's fourth and fifth issues.

### Motion for Continuance

In her sixth issue, Richard asserts that the trial court abused its discretion by denying her motion for continuance before trial based on the late production of documents Richard asserts in her first issue. Because we hold in Richard's first issue that Richard failed to demonstrate to the trial court that Towery had an obligation to produce the complained-of documents in the first place, we likewise cannot conclude that the trial court abused its discretion in failing to grant Richard

---

[6]     We also note that Richard contends, on the one hand, that she was harmed by the trial court's failure to enter judgment at the conclusion of the April 2009 trial setting, but she contends on the other hand that she was harmed by the trial court's failure to include Towery's post-April 1 assets in her share of the property division. If, however, the trial court had entered final judgment at the conclusion of the April 2009 trial setting, property acquire by Towery after that would necessarily have been his separate property.

a continuance based on her complaint that the documents were not timely produced.

We overrule Richard's sixth issue.

## Conclusion

We hold that the trial court did not abuse its discretion in the discovery ruling and judgment about which Richard complains in this appeal. We therefore affirm the trial court's judgment.

Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.